**2016-1984**

# United States Court of Appeals for the Federal Circuit

EMERACHEM HOLDINGS, LLC,

*Appellant,*

*v.*

VOLKSWAGEN GROUP OF AMERICA, INC.,

*Appellee.*

*Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in No. IPR2014-01558*

## BRIEF OF APPELLANT

Michael J. Bradford
LUEDEKA NEELY GROUP, P.C.
900 S. Gay Street, Suite 1504
P. O. Box 1871
Knoxville, TN 37901-1871
Tel: 865.546.4305

Jacobus C. Rasser
Marras Amsterdam BV
Beethovenstraat 105 B
1077HX Amsterdam
The Netherlands
Tel: +31 (0)6 5245 2741

*Counsel for Appellant,
EmeraChem Holdings, LLC*

August 10, 2016

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

EmeraChem Holdings, LLC     **v.**     Volkswagen Group of America

Case No.     16-1984

## CERTIFICATE OF INTEREST

Counsel for the:

☐ (petitioner) ☒ (appellant) ☐ (respondent) ☐ (appellee) ☐ (amicus) ☐ (name of party)

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10 % or more of stock in the party |
|---|---|---|
| EmeraChem Holdings, LLC | EmeraChem Holdings, LLC | Hunt Investors, LLC |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (**and who have not or will not enter an appearance in this case**) are:

N/A

May 17, 2016

**Date**

*[signature]*

**Signature of counsel**

Please Note: All questions must be answered

Michael J. Bradford

**Printed name of counsel**

cc:   Steven F. Meyer, Counsel for Appellee

Reset Fields

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................iv

TABLE OF ABBREVIATIONS ..............................................................v

STATEMENT OF RELATED CASES .................................................. viii

I.     STATEMENT OF JURISDICTION ..............................................1

II.    STATEMENT OF THE ISSUES ...................................................1

    1.     Whether the PTAB erred in its determination that the '558 Patent is prior art to the '758 Patent under 35 U.S.C. §102 (e) ..................................................................1

    2.     Whether the PTAB lacked authority to issue a decision for claims 3, 16, and 20 based on arguments for unpatentability not identified in the Petition and whether its decision that claims 3, 16, and 20 are unpatentable was in error .......................................................1

III.   STATEMENT OF THE CASE .......................................................1

    A.     Preliminary Statement ........................................................1

    B.     Procedural History................................................................4

    C.     Statement of Facts ...............................................................5

        i.     The '758 Patent .........................................................5

        ii.    Portions of the IPR concerning independent claims 1 and 13 ......................................................9

        iii.   Portions of the IPR concerning claims 3, 16, and 20................14

IV.    SUMMARY OF THE ARGUMENT ...........................................22

V.     ARGUMENT ...............................................................................23

    A.     Standard of Review ...........................................................23

    B.     The PTAB Erred in Determining the '558 Patent was Prior Art Under 35 U.S.C. §102(e) .........................................24

ii

          i.      Burdens of proof in IPR proceedings ................................................. 24

          ii.     EmeraChem met its burden of production by providing evidence and argument showing that the '558 Patent did not constitute prior art ..................................................................... 25

    C.    The PTAB Lacked Authority to Review Claims 3, 16, and 20 on Grounds Not Identified in the Petition or the Institution Decision ............................................................................... 36

          i.      The Federal Circuit has jurisdiction to consider this issue ................................................................................... 36

          ii.     IPR is an adjudicatory trial, not an examinational proceeding ................................................................................. 37

          iii.    The PTAB did not have the authority to create a new ground of rejection for a claim in an IPR .............................. 41

          iv.    The PTAB improperly shifted the burden of persuasion to EmeraChem ...................................................... 44

VI.    CONCLUSION ............................................................................. 48

ADDENDUM

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Belden Inc. v. Berk-Tek LLC,*
    2015 U.S. App. LEXIS 6312
    (Fed. Cir. Apr. 17, 2015) .............................................................44

*Belkin International, Inc. v. Kappos,*
    696 F.3d 1379 (Fed. Cir. 2012) ..........................................23, 39

*Cabilly v. Boss,*
    55 USPQ2d 1238 (BPAI 1998) ...................................................30

*Consol. Edison Co. v. N.L.R.B.,*
    305 U.S. 197 (1938) ...................................................................24

*Corning, Inc. v. DSM IP Assets B.V.,*
    Case IPR2013-00053, 2014 WL 1783282
    (PTAB May 1, 2014) (Paper 66) ................................................25

*Cuozzo Speed Technologies, LLC v. Lee,*
    136 S.Ct. 2131 (2016) ................................................................36

*Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.,*
    800 F.3d 1375 (Fed. Cir. 2015) ....................................25, 34, 35

*Ethicon Endo-Surgery, Inc. v. Covidien LP,*
    812 F.3d 1023 (Fed. Cir. 2016) .................................................37

*Ex Parte Boris Rubinsky,*
    APPEAL 2012-012093, 2015 WL 4640300
    (P.T.A.B. July 28, 2015) ............................................................33

*Ex Parte Ethicon, Inc.,*
    APPEAL 2012-005275, 2013 WL 3356870
    (P.T.A.B.) June 12, 2013 ......................................................29, 30

*Ex Parte John H. Griffin,*
    APPEAL 2013-000201, 2015 WL 5999262
    (P.T.A.B. Sept. 28, 2015) .....................................................28, 34

*Ex Parte Morishita,*
    APPEAL 2012-010987, 2014 WL 5490491
    (P.T.A.B. Oct. 9, 2014) ..............................................................27

*In re DeBaun,*
    687 F.2d 459 (C.C.P.A. 1982) ......................................12, 26, 32

iv

*In re Gartside*,
    203 F.3d 1305 (Fed. Cir. 2000) ....................................................24

*In re Katz,*
    687 F.2d 450 (C.C.P.A. 1969) ....................................................27

*In re Kumar*,
    418 F.3d 1361 (Fed. Cir. 2005) ........................................24, 28, 35

*In re Magnum Oil Tools Int'l, Ltd.*,
    ---F.3d ---, No. 2015-1300, 2016 WL 3974202
    (Fed. Cir. July 25, 2016) ........................... 4, 24, 42, 43, 44, 45, 47

*Intelligent Bio-Systems, Inc. v. Illumina Cambridge, Ltd.*,
    821 F.3d 1359 (Fed. Cir. 2016) ....................................................41

*Rambus Inc. v. Rea*,
    731 F.3d 1248 (Fed. Cir. 2013) ....................................................47

*Riverwood Int'l. Corp. v. R.A Jones & Co., Inc.*,
    324 F.3d 1346 (Fed. Cir. 2003) ....................................................12

*Sandt Tech., Ltd. v. Resco Metal and Plastics Corp.*,
    264 F.3d 1344 (Fed. Cir. 2001) ....................................................31

*Woodland Trust v. Flowertree Nursery, Inc.*,
    148 F.3d 1368 (Fed. Cir. 1998) ....................................................31

## Statutes

28 U.S.C. § 1295(a)(4)(A) ........................................................1

35 U.S.C. § 6 ........................................................................1

35 U.S.C. § 6(c) ...................................................................40

35 U.S.C. § 102(e) ....................................................1, 9, 10, 22, 25

35 U.S.C. § 282 ....................................................................24

35 U.S.C. § 311 ....................................................................40

35 U.S.C. § 311 (1999) .............................................................38

35 U.S.C. §§ 311-318 (1999) ........................................................38

35 U.S.C. § 312(a)(3) ..............................................................40

35 U.S.C. § 314 (1999) .............................................................38

35 U.S.C. § 314 (d) .................................................................................36

35 U.S.C. § 315 (1999) ...........................................................................39

35 U.S.C. § 315 (a)(3) .............................................................................41

35 U.S.C. § 316, 317 ...............................................................................38

35 U.S.C. § 316(e) ..................................................................................44

35 U.S.C. § 329.........................................................................................1

## Regulations:

37 C.F.R. § 1.949 (old) ...........................................................................38

37 C.F.R. § 42.100(a) ..............................................................................39

37 C.F.R. § 42.104(b)(2), (5) ..................................................................40

37 C.F.R. § 42.2 ......................................................................................39

## Other Authorities

AIPA Public Law 106-113..........................................................................38

157 Cong. Rec. at S1376 (daily ed. Mar. 8, 2011) ..................................40

157 Cong. Rec. at S1041-42 (daily ed. Mar. 1, 2011) .............................40

H.R. Rep. No. 112-98, pt.1, at 46 (2011) .................................................37

M.P.E.P. § 715.01(a) (6th Ed. Jan. 1995) .................................11, 12, 26

M.P.E.P. § 715.01(c)(I) (9th Ed. Nov. 2015) ..........................................26

M.P.E.P. § 715.04 (6th Ed. Jan. 1995) .....................................................12

M.P.E.P. § 2136.05 (7th Ed. July 1998) ...................................................11

M.P.E.P. § 2633 (Rev. 7, July 2008) ........................................................38

M.P.E.P. § 2658 (Rev. 7, July 2008) ........................................................39

*Office Patent Trial Practice Guide*,
      77 Fed. Reg. 48,756 (U.S. Patent & Trademark  Office Aug. 14, 2012) .....43

## **TABLE OF ABBREVIATIONS**

*Parties*

| | |
|---|---|
| EmeraChem | Patent Owner-Appellant EmeraChem Holdings LLC |
| Volkswagen | Petitioner-Appellee Volkswagen Group of America, Inc. |

*Terms*

| | |
|---|---|
| '558 Patent | U.S. Patent No. 5,451,558 to Campbell et al. |
| '758 Patent | U.S. Patent No. 5,599,758 to Guth et al. |
| Appx__ | Joint Appendix at page(s), with (column:lines) for patents |
| Hirota | U.S. Patent No. 5,406,790 to Hirota et al. |
| IPR | *Inter Partes* Review |
| Petition | Volkswagen's Petition for *Inter Partes* Review of '758 Patent |
| PTAB | Patent Trial and Appeal Board |
| PTO | United States Patent and Trademark Office |
| Saito | Japanese Patent Application Publication No. 62-106826 A to Saito et al. |
| Stiles | U.S. Patent No. 5,362,463 to Stiles et al. |
| Takeshima | European Patent Application Publication No. 0 560 991 A1 to Takeshima et al. |

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5(a), Appellant provides as follows:

(a) There have been no previous appeals in this proceeding.

(b) This court's decision will directly affect the following litigation: *EmeraChem Holdings, LLC v. Volkswagen Group of America, Inc., Volkswagen AG, and Volkswagen Group of America Chattanooga Operations, LLC*, No. 14-cv-132-TAV (E.D. Tenn.), filed on March 31, 2014. Claims for infringement of the claims of U.S. Patent No. 5,599,758, which patent is the subject of this appeal, have been asserted against the defendants in the litigation.

# I.    STATEMENT OF JURISDICTION

The PTAB had jurisdiction over Appellee Volkswagen's petition for *inter partes* review under 35 U.S.C. § 6.  The PTAB issued a final written decision on January 22, 2016, finding all challenged claims of the '758 Patent unpatentable.  Appx0001.  Appellant EmeraChem timely filed its notice of appeal on March 24, 2016.  *See* Dkt. No. 1-2.  This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 329.

# II.    STATEMENT OF THE ISSUES

1.    Whether the PTAB erred in its determination that the '558 Patent is prior art to the '758 Patent under 35 U.S.C. § 102(e).

2.    Whether the PTAB lacked authority to issue a decision for claims 3, 16, and 20 based on arguments for unpatentability not identified in the Petition and whether its decision that claims 3, 16, and 20 are unpatentable was in error.

# III.    STATEMENT OF THE CASE

## A.    Preliminary Statement

In its Final Written Decision, the PTAB concluded that all of the challenged claims of the '758 Patent were obvious based on a single ground – obviousness over the '558 Patent in view of Saito and further in view of Stiles.  At the center of this conclusion was the PTAB's determination that another patent owned by EmeraChem – the '558 Patent – was prior art to the '758 Patent under 35 U.S.C. § 102(e).

Prior art under 35 U.S.C. § 102(e) must have been filed "by another."  A reference does not qualify as 102(e) prior art if the inventors of the patent at issue also invented the subject matter in the reference asserted to be 102(e) prior art.  With its Response, EmeraChem submitted the declaration of Larry E. Campbell, which unequivocally stated that Campbell and Guth – the '758 Patent inventors – solely invented all of the subject matter in the '558 Patent that was cited against the independent claims.  As such, the cited portions of the '558 Patent were not "by another" and do not qualify as 102(e) prior art.  CCPA authority, PTAB authority and old and current versions of the MPEP have all explained that, in the absence of contradictory evidence, such an unequivocal declaration is sufficient to remove a reference as 102(e) prior art.

As the petitioner in an IPR proceeding against a presumptively valid patent, Volkswagen had the ultimate burden to prove that the '558 Patent qualifies as 102(e) prior art.  Once EmeraChem submitted the Campbell declaration, the burden of production shifted to Volkswagen to prove that the cited portions of the '558 Patent qualify as 102(e) prior art in view of the Campbell declaration.  However, in Volkswagen's Reply, Volkswagen did not submit any evidence to contradict the Campbell declaration.  As such, Volkswagen cannot have met its burden to prove the cited portions of the '558 Patent qualify as 102(e) prior art.

Nevertheless, in the Final Written Decision, the PTAB determined that the '558 Patent is 102(e) prior art. In doing so, the PTAB gave no weight to the Campbell declaration because there was no corroborating documentary evidence. As such, the PTAB held that EmeraChem had failed to meet its burden of production to provide evidence that the '558 Patent does not qualify as prior art. However, the Campbell declaration should have been sufficient for EmeraChem to prevail on the issue. It was certainly more than sufficient for EmeraChem to have met its burden of production.

Additionally, with respect to dependent claims 3, 16, and 20 of the '758 Patent, Volkswagen's Petition only cited portions of Saito as allegedly disclosing the elements of each of the claims. In the Patent Owner's Response, EmeraChem showed that Volkswagen's assertions concerning these claims were incorrect. Saito does not disclose the limitations of claims 3, 16, and 20.

In the Final Written Decision, the PTAB appears to agree with EmeraChem – it did not determine that the limitations of claims 3, 16, or 20 were disclosed by Saito. Nevertheless, it still determined that the claims were obvious by asserting the claim limitations were disclosed by a different patent - Stiles. However, prior to the Final Written Decision, no one had ever asserted that Stiles disclosed the limitations of claims 3, 16, or 20. The Final Written Decision is the very first time this argument was made. By presenting these new arguments in the Final Written

Decision, the Board procedurally deprived EmeraChem of any opportunity to submit a response. As the Federal Circuit recently explained, there is "no support for the PTO's position that the Board is free to adopt arguments on behalf of petitioners that could have been, but were not, raised by the petitioner during an IPR. Instead, the Board must base its decision on arguments that were advanced by a party, and to which the opposing party was given a chance to respond." *In re Magnum Oil Tools Int'l, Ltd.*, --- F.3d ---, No. 2015-1300, 2016 WL 3974202, at *10 (Fed. Cir. July 25, 2016). Additionally, the PTAB erred in not requiring Volkswagen to show that a person of ordinary skill in the art would have been motivated to combine Saito and Stiles. As such, the PTAB's determination that claims 3, 16, and 20 are obvious based on arguments not raised by Volkswagen and presented for the first time in the Final Written Decision is in error.

### B.    Procedural History

On September 30, 2014, Volkswagen filed its petition for IPR, requesting IPR with respect to claims 1-14 and 16-20 of the '758 Patent. Appx0071, Appx0130. On March 16, 2015, the PTAB issued its Decision to Institute *Inter Partes* Review on all challenged claims (Appx0156), and on January 22, 2016, the PTAB issued its Final Written Decision determining that claims 1-14 and 16-20 are unpatentable. Appx0001, Appx0054.

## C. Statement of Facts

### i. The '758 Patent

The application that issued as the '758 Patent was filed on December 23, 1994 and lists two inventors – Eugene D. Guth ("Guth") and Larry E. Campbell ("Campbell"). Appx0059. Guth and Campbell assigned their rights to EmeraChem's predecessor, Goal Line Environmental Technologies. *Id.* The '758 Patent builds upon an application filed ten months previously – on February 4, 1994 – which issued as the '558 Patent. Appx0060. The '558 Patent also lists Guth and Campbell as inventors, as well as two additional inventors – Robert Danziger and Sally Padron. Appx0489. The inventors of the '558 Patent also assigned their rights to Goal Line. *Id.*

The '758 Patent "incorporate[s] herein in its entirety" the '558 Patent. Appx0060 at col. 1, ln. 56-57. The '558 Patent discloses a catalyst/absorber used for removing NOx from an exhaust stream. Appx0060 at col. 1, ln. 57 – col. 2, ln.16. After an extended exposure of the catalyst/absorber to the exhaust stream, the absorber becomes saturated with NOx, and its ability to absorb more NOx from the exhaust stream is diminished. As such, the catalyst/absorber requires regeneration. Appx0496 at col. 6, ln. 60-61. The method for regenerating the catalyst/absorber contemplated in the '558 Patent required removal of the catalyst/absorber from the exhaust system, which was considered undesirable and was not commercially viable.

In addition, this method produced large quantities of a liquid waste stream. Appx0060 at col. 2, lines 31-33.

The purpose of the invention of the '758 Patent is to provide a regeneration method for the catalyst/absorber disclosed in the '558 Patent that can be carried out *in situ*, and without liquid reagents. Appx0060 at col. 2, lines 38-41. The method comprises passing a regenerating gas over the catalyst/absorber. *Id.* at col. 2, lines 48-51. The '758 Patent explains that the regeneration gas has two components. Appx0061 at col. 3, ln. 5-7. One is the reactant gases, in this case hydrogen and/or carbon monoxide. *Id.* at col. 3, ln. 3-5. "The remainder of the regeneration gas is the carrier gas mixture." *Id.* at col. 3, ln. 6-7. The '758 Patent explains at Appx0061, col. 3, lns. 8-16:

> The carrier gas may comprise principally nitrogen or steam, for example, preferred 50 percent or more nitrogen and may have smaller concentrations of carbon dioxide and steam or 50 percent or more steam and may have smaller concentrations of nitrogen and carbon dioxide. Nitrogen in high concentrations of about 50% to about 80% provides an excellent carrier for the reductants. Steam is also a good carrier in concentrations of 30% to 98% with the balance being nitrogen.

As such, the "carrier gas" is the gas mixture which carries the reactant gases to the catalyst/absorber for regeneration.

The carrier gas in the gas mixture must be inert. *See* Appx0064 at claims 1 and 13. An "inert" carrier gas is a carrier gas which does not contain a significant amount of a gas that can react with the reducing agents used for catalyst regeneration

(i.e. the reactant gases). As one example, a carrier gas containing significant amounts of oxygen is not an inert carrier gas, since the oxygen will react with the reducing gas. The '758 Patent explains the regeneration gas "is substantially oxygen free, although up to one percent oxygen may be present without significant negative effects." Appx0061 at col. 3, ln. 16-18; *see also* Appx1076 at 171:5-9. In its Final Written Decision, the PTAB held the "inert" claim language "to limit the amount of oxygen in the regeneration gas to no more than one percent." Appx0008-0009.

The '758 Patent includes two independent claims – claims 1 and 13. Appx0064. Independent claim 1, which is drawn to regenerating a catalyst/absorber that includes an alumina support with a platinum coating thereon, recites:

> 1. A method of regenerating a devitalized absorber having nitrogen oxides absorbed therein or thereon, said method comprising the steps of:
>
> providing a stream of regenerating gas comprising a reducing gas, said reducing gas having an effective amount for removing said nitrogen oxides from said devitalized absorber, and an inert carrier gas; and
>
> passing said stream of regenerating gas comprising an inert carrier gas and a component selected from the group consisting of hydrogen, carbon monoxide and mixtures thereof over said devitalized absorber comprising an alumina support with a platinum coating thereon and having nitrogen oxides absorbed therein or thereon for an effective time, at an effective temperature and at an effective space velocity to remove said nitrogen oxides from said devitalized absorber to form a regenerated absorber.

Claims 2-12 depend from claim 1 and include additional limitations concerning the composition of the gases used in the method, the velocity that the gases are passed over the catalyst/absorber, and the composition of the catalyst/absorber. Of

particular note with regard to this appeal is claim 3, which requires that the "regeneration gas further comprises up to 10% carbon dioxide." *Id.*

Independent claim 13 recites:

13. A method of regenerating a devitalized catalyst/absorber and having nitrogen oxides absorbed therein or thereon, comprising the steps of:

providing a stream of inert carrier gas containing an effectuating amount of a reducing agent selected from carbon monoxide, hydrogen gas and mixtures thereof said stream further characterized as containing at least carbon monoxide or carbon dioxide for removing said nitrogen oxides from said catalyst/absorber and restoring a carbonate form for said alkali or alkaline earth;

passing said gaseous stream over said exhausted catalyst/absorber comprising an oxidation catalyst specie selected from platinum, palladium, rhodium, cobalt, nickel, iron, copper, molybdenum or combinations thereof disposed on a high surface area support, said catalytic component being intimately and entirely coated with an absorber material selected from a hydroxide, carbonate, bicarbonate or mixture thereof of an alkali or alkaline earth or mixtures thereof and having nitrogen oxides absorbed therein or thereon for an effective time, at a temperature in the range of 250.degree. to 750.degree. F. and at a GHSV in the range of 10 to 100,000 hr.$^{-1}$ to remove said nitrogen oxides from said devitalized catalyst/absorber to form a regenerated catalyst/absorber.

Claims 14-20 depend from claim 13 and include additional limitations concerning the composition of the gases used in the method and the composition of the catalyst/absorber. Of particular note in this appeal are claims 16 and 20, which are identical to each other and require "wherein said inert carrier gas comprises steam." *Id.*

ii.    Portions of the IPR concerning independent claims 1 and 13

In its Petition, Volkswagen asserted four grounds of unpatentability against independent claim 1 – anticipation by Hirota, anticipation by Takeshima, anticipation by Saito, and obviousness over the '558 Patent in view of either Hirota or Saito, in view of Stiles.  Appx0081.  Volkswagen asserted two of the same grounds of unpatentability against independent claim 13 - anticipation by Saito, and obviousness over the '558 Patent in view of either Hirota or Saito, in further view of Stiles. *Id.*

In the Final Written Decision, the PTAB determined that Volkswagen had failed to establish that claims 1 or 13 were anticipated by Hirota, Takeshima, or Saito.  Appx0053.  The PTAB also determined that Volkswagen had failed to establish that claims 1 or 13 were obvious over the '558 Patent in view of Hirota in further view of Stiles.  Appx0043.  However, the PTAB determined that Volkswagen had established that claims 1 and 13 were obvious over the '558 Patent in view of Saito in further view of Stiles.  Appx0043-0045.  In reaching the conclusion that claims 1 and 13 were obvious, the PTAB determined that the '558 Patent was prior art under 35 U.S.C. § 102(e), despite EmeraChem's evidence and argument to the contrary.  Appx0026-0033.

As noted previously, the '558 Patent and the '758 Patent are commonly owned. The application that issued as the '758 Patent was filed on December 23,

1994 and lists two inventors – Guth and Campbell. Appx0059. The application that issued as the '558 Patent was filed on February 4, 1994 and also lists Guth and Campbell as inventors, as well as two additional inventors – Robert Danziger and Sally Padron. Appx0489. In its Petition, Volkswagen asserted that because the two patents have different listed inventors, the '558 Patent was granted on an application "by another" and therefore qualifies as prior art under 35 U.S.C. § 102(e). Appx0115. As such, Volkswagen asserted that the '558 Patent was prior art that disclosed the catalyst/absorber elements of various claims, with Saito or Hirota meeting the regeneration system requirements of the claims. Appx0118. Stiles was cited only as providing motivation to combine the '558 Patent catalyst/absorber with the regeneration system of Hirota or Saito. Appx0118.

With regard to independent claims 1 and 13, Volkswagen's claim charts specified that the catalyst/absorber limitations in the claim were disclosed in the '558 Patent in the Abstract, at column 4, lines 44-47, and at column 12, lines 30-38 (claim 1). Appx0118-0122, Appx0125-0127.

In the Patent Owner's Response, EmeraChem explained that the portions of the '558 Patent cited against independent claims 1 and 13 did not qualify as prior art under 102(e). Appx0221-0225. In this regard, the M.P.E.P. version applicable during the pendency of the application that issued as the '758 Patent explains the following concerning this scenario with regard to 102(e) rejections:

- 10 -

715.01(A) Reference is a Joint Patent to Applicant and Another[R-14]

When subject matter, disclosed but not claimed in a patent issued jointly to S and another, is claimed in a later application filed by S, the joint patent is a valid reference unless overcome by affidavit or declaration under 37 CFR 1.131**> **or an unequivocal declaration by S that he conceived or invented the subject matter disclosed in the patent** (*In re DeBaun,* 214USPQ 933(CCPA 1982). <Disclaimer by the other patentees should not be required >but, if submitted, may be accepted by the examiner<.

M.P.E.P. § 715.01(a) (6th Ed. Jan. 1995) (emphasis added). Furthermore, the subsequent Seventh edition of the M.P.E.P., which is applicable to the same relevant statutes as the Sixth edition, explains the following concerning this scenario with regard to 102(e) rejections:

"The fact that an application has named a different inventive entity than a patent does not necessarily make that patent prior art." *Applied Materials Inc. v. Gemini Research Corp.,* 835 F.2d 279,15 USPQ2d 1816 (Fed. Cir. 1988). The issue turns on what the evidence of record shows as to who invented the subject matter. *In re Whittle,* 454 F.2d 1193,1195,172 USPQ 535, 537 (CCPA 1972). In fact, even if applicant's work was publicly disclosed prior to his or her application, applicant's own work may not be used against him or her unless there is a time bar under 35 U.S.C. 102(b). *In re DeBaun,* 687 F.2d 459,214 USPQ 933 (CCPA 1982) (citing *In re Katz, 687* F.2d 450, 215 USPQ 14 (CCPA 1982). Therefore, when the unclaimed subject matter of a patent is applicant's own invention, applicant may overcome a *prima facie* case based on the patent by showing that the patent disclosure is a description of applicant's own previous work.

M.P.E.P. §2136.05 (7th Ed. July 1998).

In accordance with the guidance provided by these applicable provisions of the M.P.E.P, EmeraChem submitted the unequivocal declaration from Larry E.

Campbell that he and Eugene D. Guth solely conceived of and invented the

following portions of the '558 Patent[1]:

A.    The "catalyst absorber, preferably made of alumina/platinum/
      carbonate salt, is used to oxidize the pollutant oxides and absorb them"
      as disclosed in the abstract.

B.    "A material for removing gaseous pollutants from combustion exhaust
      comprising an oxidation catalyst specie selected from platinum,
      palladium, rhodium, cobalt, nickel, iron, copper, molybdenum or
      combination thereof disposed on a high surface area support, said
      catalytic component being intimately and entirely coated with an
      absorber selected from a hydroxide, carbonate, bicarbonate or mixture
      thereof of an alkali or alkaline earth or mixtures thereof" as disclosed
      and claimed in claim 1.

C.    "After the catalyst absorber is spent or partially spent, it can be
      reactivated.  Reactivation is accomplished by removing and replacing
      the spent absorber and disposing of the removed spent absorber" as
      disclosed at column 4, lines 44-47.

See Appx1105.  These are the only portions of the '558 Patent relied upon by

Volkswagen in support of its obviousness assertion against independent claims 1 and

13.    Accordingly, EmeraChem explained that Larry Campbell's declaration

established that the portions of the '558 Patent cited against independent claims 1

and 13 were not "by another" and therefore do not qualify as prior art under 102(e),

citing M.P.E.P. § 715.01(a) (6th Ed. Jan. 1995); *In re DeBaun,* 687 F.2d at 462-463;

*Riverwood Int'l. Corp. v. R.A. Jones & Co., Inc.*, 324 F.3d 1346, 1355-1357 (Fed.

---

[1] Eugene D. Guth has passed away and was therefore unavailable to sign a
declaration.  However, M.P.E.P. § 715.04 (6th Ed. Jan. 1995) explains that a
declaration from only one of two joint inventors is sufficient.

Cir. 2003). Appx0224-0225.     As explained in the Patent Owner's Response, because the '558 Patent served as the primary reference relied upon for the obviousness assertion against independent claims 1 and 13, but the '558 Patent is not prior art against those claims, Volkswagen's obviousness assertion must fail. Because the '558 Patent cannot be cited against claims 1 or 13, the obviousness assertion against the claims that depend from independent claim 1 – claims 2-12 – or independent claim 13 – claims 14 and 16-20 – must also fail.

In Volkswagen's Reply, Volkswagen did not provide any evidence to contradict Campbell's declaration.     Appx0346-0348.     Of particular note, Volkswagen did not even cross-examine Campbell concerning his declaration. Appx0028.     Rather, Volkswagen responded by asserting that the Campbell declaration "is insufficient because there is no accompanying evidence explaining the inventorship assertions in the declaration." Appx0347.  Volkswagen asserted that "Campbell's failure to provide an evidentiary-based 'story' corroborating his assertion of inventorship should result in his Declaration … being given no weight." Appx0348.

In the Final Written Decision, the PTAB did not fault Volkswagen for its failure to produce any evidence contradictory to the Campbell declaration.  In fact, the PTAB explicitly stated it drew no adverse inference from Volkswagen's election not to cross-examine Campbell.  Appx0028.  Rather, the PTAB held that the '558

Patent qualified as prior art because "Patent Owner has failed to carry its burden of production." Appx0032. In making this determination, the PTAB did not require Volkswagen to prove that the '558 Patent was prior art. Rather, the PTAB chose to give the Campbell declaration no weight whatsoever, explaining "[w]e decline to credit the Campbell testimony, principally because there is *no contemporaneous documentary evidence* confirming *events taking place a long time ago* reported to us via a witness having an *interest* in the case." Appx0032 (emphasis in original).[2]

### iii.    Portions of the IPR concerning claims 3, 16, and 20

As noted above, claims 3, 16, and 20 are dependent claims. Claim 3 depends from independent claim 1 and claims 16 and 20 depend from independent claim 13. Volkswagen proposed two grounds for unpatentability of claims 3, 16, and 20.

First, Volkswagen proposed that the claims were anticipated by Saito. Appx0081. Second, Volkswagen proposed that the claims were obvious over the combination of the '558 Patent and either Hirota or Saito, in view of Stiles. Appx0114. In particular, Volkswagen proposed that it was obvious to use the *in situ* regeneration techniques disclosed in Hirota and Saito to regenerate the catalyst/absorber disclosed in the '558 Patent. Appx0118. Stiles was cited only as

---

[2] The Board also "noted" that Campbell's testimony did not address subject matter asserted against dependent claims and subject matter not relied upon in the Petition's claim charts as disclosing elements of independent claims 1 and 13. Appx0032. However, removal of the Campbell reference as prior art against the independent claims, by necessity, renders the claims dependent thereon patentable.

providing the motivation for combining the '558 Patent with Saito or Hirota. *Id*. Specifically, Volkswagen explained "Stiles provides the motivation for applying known techniques … of Campbell … using the known reducing agents disclosed in Hirota or Saito." *Id*. Volkswagen did not propose that the Stiles regeneration gas should be combined with Campbell (i.e. the '558 Patent) or that any aspect of the Stiles regeneration method should be combined with the catalyst regeneration method of Saito or Hirota. *See* Appx0114-0118

In this regard, Volkswagen provided "[c]laim charts identifying specific portions of Campbell (Ex. 1003) that support, in combination with Hirota (Ex. 1006) or Saito (Ex. 1008), a showing that claims 1-14 and 16-20 are obvious over the combination of Campbell and either Hirota or Saito." Appx0118. Notably, Volkswagen did not state that Stiles was being cited in the claims charts in support of the obviousness assertion. *Id.* Likewise, no portion of Stiles was cited in the claim charts against claims 3, 16, or 20. Appx0123, Appx0127, Appx0129.

With regard to claims 3, 16, and 20, Volkswagen's Petition only asserted that Saito disclosed the limitations in those claims. The only portion of the Petition that specifically discussed claims 3, 16 or 20 are the claim charts. For claim 3, Volkswagen submitted the following in its claim chart (Appx0123):

| | Claims from Guth et al. U.S. Patent No. 5,599,758 | CAMPBELL AND EITHER HIROTA OR SAITO |
|---|---|---|
| 3 | The method of claim 1 wherein said regenerating gas further comprises up to 10% carbon dioxide. | **Saito:** The exhaust gas contains "1 to 15 vol. % of carbon dioxide gas." Ex. 1008 at p. 4. |

For claims 16 and 20, Volkswagen submitted the following (Appx127, Appx129):

| 16 | The method of claim 14 wherein said inert carrier gas comprises steam. | **Saito:** The exhaust gas contains "1 to 15 vol. % of water vapor," and temperature is "150 to 800° C, and in particular 200 to 700° C." Ex. 1008 at p. 4. |
|---|---|---|

| | Claims from Guth et al. U.S. Patent No. 5,599,758 | CAMPBELL AND EITHER HIROTA OR SAITO |
|---|---|---|
| 20 | The method of claim 14 wherein said inert carrier gas comprises steam.[4] | **Saito:** The exhaust gas contains "1 to 15 vol. % of water vapor," and temperature is "150 to 800° C, and in particular 200 to 700° C." Ex. 1008 at p. 4. |

In its Institution Decision, the PTAB instituted *inter partes* review on all grounds asserted by Volkswagen. Claims 3, 16, and 20 were addressed in the Institution Decision as follows (Appx0175-0176):

Claim 3—Ex. 1008B, Saito at p. 4, col. 1, 2d full paragraph (1 to 15 vol. % carbon monoxide).

Claim 16—Ex. 1008B, Saito, p. 4, 2d full paragraph (1 to 15 vol% water).

Claim 20—*see* Petition, p. 60.

There was no discussion whatsoever in the Institution Decision regarding any disclosure in Stiles of the limitations of claims 3, 16, or 20 or that any regeneration gas in Stiles included the carbon dioxide or steam required by the claims.

In the Patent Owner's Response, EmeraChem explained that many of Volkswagen's assertions concerning Saito were in error, submitted expert testimony on the issue, and submitted cross-examination testimony from Volkswagen's expert on the issue. Appx0211-0221. In particular, with regard to claim 3, Volkswagen had asserted that Saito's <u>exhaust gas</u> met the requirements of a regenerating gas containing carbon dioxide. However, EmeraChem explained that nothing in Saito suggested a <u>regenerating gas</u> that contained the requisite carbon dioxide. Appx0217-0219, Appx0230-0232. The exhaust gas cited by Volkswagen in the claim charts as including carbon dioxide does not flow during regeneration in Saito and therefore does not form a part of the regenerating gas. *Id.*

In this regard, Saito discloses a method for removing NOx in an exhaust gas using a catalyst. Saito also discloses a method for regenerating the catalyst using a reducing agent such as carbon monoxide or hydrocarbons. Saito notes the following concerning known regeneration methods:

> The method of reducing NOx using a reducing agent such as hydrogen
>
> is widely known as a nonselective catalytic reduction method, but in
>
> this method, if large amounts of oxygen are present in the exhaust gas

> [amounts of] reducing agent sufficient to react with the oxygen will be
> added and the NOx will be reduced, which is not economical in so much
> as large amounts of reducing agent are consumed.

Appx0574, left column.  Accordingly, Saito seeks to avoid introduction of a reduction agent into the exhaust gas.  Saito accomplishes this using two catalyst beds and regenerating each catalyst independently of the other.  Saito explains the following concerning its regeneration method:

> After [the exhaust gas] has been introduced to one of the catalyst beds
> for a fixed period of time, [the exhaust gas] is introduced to the other
> catalyst bed by way of the switching valve. In cases where hydrogen
> has been selected as the gaseous reducing agent, hydrogen generated
> by a hydrogen generation device 2 is introduced to the catalyst bed
> through which exhaust gas is not flowing.

Appx0574, right column.  As such, Saito explains that the exhaust gas is "not flowing" during regeneration.  Both EmeraChem's expert and Volkswagen's expert agreed on this issue.  Appx0219, Appx1096-1097, Appx1077 at 175:4-10.  Therefore, Saito does not disclose a regenerating gas containing carbon dioxide.

Likewise, for claims 16 and 20, Volkswagen had asserted that Saito's exhaust gas met the requirements of claims 16 and 20 that require an inert carrier gas, which forms part of the regenerating gas, containing steam.  However, again, EmeraChem

explained that Saito's exhaust gas does not flow during regeneration and therefore does not form a part of the regenerating gas. Appx0220-0221, Appx0231-0232. Therefore, Saito does not disclose any portion of a regenerating gas containing steam.

In its Reply, Volkswagen did not challenge EmeraChem's assertions regarding Saito, and thus appeared to agree that the cited portions of Saito from its Petition did not meet the limitations of claims 3, 16, and 20. Appx0344-0345. Instead, Volkswagen argued for the first time that alternate, non-preferred embodiments from Saito disclosed a regenerating gas containing carbon dioxide and steam.[3] *Id.* Volkswagen did not assert that Stiles or any other prior art reference disclosed the requirements of claims 3, 16, or 20. The only discussion of Stiles in the Reply related to Volkswagen's argument that Stiles provided the motivation to combine the catalyst/absorber of the '558 Patent with the regeneration system of Hirota or Saito. Appx0348-0351. Again, Volkswagen did not propose that it was proper to combine the '558 Patent with the regeneration system in Stiles.

At Oral Argument, EmeraChem's counsel again explained that Saito did not teach the requirements of claims 3, 16, or 20. Appx0393-0395. Volkswagen did not

---

[3] EmeraChem filed a motion to exclude this new argument concerning Saito's alleged non-preferred embodiment on the basis that a petitioner is not allowed to introduce new arguments for the first time in a reply. The Board did not rule on the motion in the Final Written Decision, but rather dismissed the motion as moot. Appx0049-0050.

respond to these arguments or present any other argument concerning claims 3, 16, and 20. Also, in its questions presented to EmeraChem, the PTAB made no mention of any other prior art disclosing the requirements of claims 3, 16, and 20.

In its Final Written Decision, the PTAB determined that Saito did not anticipate any claims of the '758 Patent. Appx0018-0025. However, as noted above, the PTAB determined that independent claims 1 and 13 were rendered obvious by a combination of the Saito regeneration method and the '558 Patent catalyst/absorber. In particular, the PTAB stated "the regeneration techniques described by those references, i.e., the device illustrated in Figure 1 of Saito, would have been equally applicable for regenerating in the Campbell environment." Appx0042. Furthermore, in a specific discussion of claim 13, the PTAB states "[i]t is the combination of using Saito's known *in situ* regeneration technique in the Campbell environment that renders regeneration of the carbonate form obvious to one skilled in the art." Appx0044.

However, with regard to claims 3, 16, and 20, the PTAB did not determine that the claim limitations were disclosed by Saito. As such, the PTAB appears to agree with EmeraChem's explanation that Saito does not teach the limitations required by Claims 3, 16, and 20. Nevertheless, the PTAB still found these claims obvious. For claim 3, the PTAB stated – "Overlooked, and not addressed by Patent

Owner, is a description of the use of carbon dioxide in reducing gas described by

Stiles." Appx0044.  For claims 16 and 20, the PTAB stated (Appx0045):

> Overlooked by Patent Owner is a teaching in Stiles that the regeneration gas can contain 'water vapor.'  Ex. 1009A, col. 5:55.  What is clear from the record is that regeneration gas can contain hydrogen, nitrogen, carbon dioxide, and water vapor per Stiles and hydrogen, ammonia, carbon monoxide, and hydrocarbons per Saito.  Selection of a particular gas has not been shown to be beyond the skill in this art.  In fact, we note that the selection of a particular gas appears to be a function of the reduction process undertaken.

Based on this reasoning, the PTAB found claims 3, 16, and 20 to be obvious

over a combination of the '558 Patent catalyst/absorber and the regeneration system

of Saito, and further by taking a component from the regeneration gas of Stiles and

adding it to the Saito regeneration gas.  In doing so, the PTAB went so far as to state

that EmeraChem had overlooked teachings in Stiles.  However, the PTAB failed to

note that Volkswagen never made these arguments and EmeraChem never had

reason to look into these alleged teachings. Volkswagen has never asserted that

Stiles disclosed the limitations of clams 3, 16, and 20.  Volkswagen only relied on

Stiles for the assertion that it provided the motivation to combine the '558 Patent

and Saito.  Similarly, Volkswagen has never argued that aspects of the Saito system

should be or could be combined with aspects of the Stiles system or that there was

any motivation to do so.   The Final Written Decision is the very first time that these

arguments were made.  By making these new arguments, the PTAB procedurally

deprived EmeraChem of any opportunity to submit a response or to have an expert

opine on the issue as to whether it was appropriate to substitute aspects of the Saito's system with aspects of Stiles' system.

## IV.    SUMMARY OF THE ARGUMENT

*The PTAB erred in determining the '558 Patent was prior art under 35 U.S.C. § 102(e).*  As the petitioner in an IPR proceeding against a presumptively valid patent, Volkswagen had the ultimate burden to prove that the '558 Patent qualifies as 102(e) prior art.  Once EmeraChem submitted the Campbell declaration, the burden of production shifted to Volkswagen to prove that the cited portions of the '558 Patent qualify as 102(e) prior art in view of the Campbell declaration. However, in Volkswagen's Reply, Volkswagen did not submit any evidence to contradict the Campbell declaration.  As such, Volkswagen cannot have met its burden to prove the cited portions of the '558 Patent qualify as 102(e) prior art.

The Campbell declaration should have been sufficient to show that the cited portions of the '558 Patent were not "by another" and do not qualify as 102(e) prior art.  It was certainly more than sufficient for EmeraChem to have met its burden of production.  The Board's determination that EmeraChem had failed to meet its burden of production was in error and its determination that claims 1-14 and 16-20 are unpatentable based on the '558 Patent in combination with other references was in error.

*The PTAB lacked authority to review claims 3, 16, and 20 on theories not identified in the Petition.* Volkswagen's Petition only cited portions of Saito as allegedly disclosing the elements of claims 3, 16, and 20.  In the Patent Owner's Response, EmeraChem showed that Volkswagen's assertions concerning these claims were incorrect.  Saito does not disclose the limitations of claims 3, 16, and 20.  Nevertheless, in the Final Written Decision, the PTAB determined that the claims were obvious by asserting the claim limitations were disclosed by a different patent - Stiles.  However, the Final Written Decision is the very first time this argument was made.  By presenting these new arguments in the Final Written Decision, the PTAB procedurally deprived EmeraChem of any opportunity to submit a response.  The PTAB does not have the authority to base its decision on theories that were not raised by Volkswagen in the Petition.  Additionally, the PTAB erred in not requiring Volkswagen to show that a person of ordinary skill in the art would have been motivated to combine Saito and Stiles.  Accordingly, this Court should reverse the PTAB's decision that claims 3, 16, and 20 are unpatentable.

## V.    ARGUMENT

### A.  Standard of Review

The PTAB's legal conclusions and statutory interpretation are reviewed *de novo*.  *Belkin International, Inc. v. Kappos,* 696 F.3d 1379, 1381 (Fed. Cir. 2012).  The PTAB's determination of obviousness is reviewed *de novo* and the factual

findings underlying the determination are reviewed for substantial evidence. *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

## B. The PTAB Erred in Determining the '558 Patent Was Prior Art Under 35 U.S.C. § 102(e)

i.  <u>Burdens of proof in IPR proceedings</u>

Initially, the differences in the burden of establishing obviousness in patent application prosecution (prior to a patent grant) and the burden of establishing obviousness in an *inter partes* review, should be noted.  In patent prosecution, there is a shifting burden of persuasion.  *Magnum Oil Tools*, 2016 WL 3974202, at *6.  The Federal Circuit explained the shifting burden in *In re Kumar*, 418 F.3d 1361, 1366 (Fed. Cir. 2005):

> During examination, the examiner bears the initial burden of establishing a *prima facie* case of obviousness. *Oetiker,* 977 F.2d at 1445. The *prima facie* case is a procedural tool, and requires that the examiner initially produce evidence sufficient to support a ruling of obviousness; thereafter the burden shifts to the applicant to come forward with evidence or argument in rebuttal. *Piasecki,* 745 F.2d at 1475. When rebuttal evidence is provided, the *prima facie* case dissolves, and the decision is made on the entirety of the evidence. *Oetiker,* 977 F.2d at 1445; *In re Spada,* 911 F.2d 705, 708 (Fed.Cir.1990); *In re Rinehart,* 531 F.2d 1048, 1052 (CCPA 1976).

After a patent issues, under 35 U.S.C. § 282, the patent is presumed valid and the burden of establishing invalidity rests on the party asserting invalidity.  In an *inter partes* review, the burden of persuasion is on the petitioner to prove

unpatentability "and that burden never shifts to patentee." *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015). Also, there is a second and distinct burden of production that does shift in some circumstances. As explained in *Dynamic Drinkware*, when a reference is argued to be 102(e) prior art, the petitioner has the initial burden of production to put forward a reference as 102(e) prior art. *Id.* at 1379-1380. The burden of production then shifts to the patent owner "to argue or produce evidence" that the reference does not qualify as prior art. *Id.* The burden then shifts back to the petitioner "to prove" the reference is in fact prior art in view of the evidence and argument submitted by the patent owner. *Id.*

The PTAB has explained that the petitioner's ultimate burden of production is higher in an *inter partes* review, as compared to examination and even re-examination, explaining in *Corning Inc. v. DSM IP Assets B.V.*, Case IPR2013-00053, 2014 WL 1783282, at *4 (PTAB May 1, 2014) (Paper 66):

> This *inter partes* review is neither examination nor reexamination; and no claim has been "rejected." Most significantly, in examination and reexamination (both *ex parte* and *inter partes*), no discovery is allowed. … In contrast, an *inter partes* review provides for discovery, albeit limited, as an integral part of the proceeding. *See* 35 U.S.C. § 316(a)(5); 37 C.F.R. § 42.51. With the opportunity to cross-examine declarants and affiants, a petitioner is better equipped to sift out facts from wishful thinking.

ii.  <u>EmeraChem met its burden of production by providing evidence and argument showing that the '558 Patent did not constitute prior art</u>

In order for a patent to qualify as 102(e) prior art, the patent must be "by another." 35 U.S.C. § 102(e). The Campbell declaration submitted with Patent

- 25 -

Owner's Response was sufficient to remove the '558 Patent as a prior art.  It was certainly sufficient to meet EmeraChem's burden of production, such that the ultimate burden shifted back to Volkswagen.   In this regard, the Campbell declaration unequivocally stated that Campbell and Guth – the '758 Patent inventors – solely invented all of the subject matter in the '558 Patent that was cited against independent claims 1 and 13.  As such, the cited portions of the '558 Patent were not "by another" and do not qualify as 102(e) prior art.

When the application that issued as the '558 Patent was pending, the M.P.E.P. section applicable to this situation stated "an unequivocal declaration by S that he conceived or invented the subject matter disclosed in the patent" was all that was needed to remove a reference as 102(e) prior art.  M.P.E.P. § 715.01(a) (6th Ed. Jan. 1995).  In making this statement, the M.P.E.P. section cites *In re DeBaun*, 687 F.2d 459, 463 (C.C.P.A. 1982), where the court removed a reference as 102(e) prior art cited in prosecution of a patent application "[o]n the basis of the record here, which includes appellant's unequivocal declaration that he conceived anything in the '678 patent disclosure which suggests the invention claimed in his present application."

Similarly, the current version of the M.P.E.P. provides that an "affidavit or declaration by applicant alone" stating that the inventor is the sole inventor of the subject matter cited in the prior reference is sufficient to remove the reference as prior art.  M.P.E.P. § 715.01(c)(I) (9th Ed. Nov. 2015).  In doing so, the M.P.E.P.

cites *In Re Katz*, 687 F.2d 450 (C.C.P.A. 1969), which was an appeal of a PTAB

decision upholding rejection of a patent application.  In *Katz*, the CCPA overturned

a PTAB ruling determining that a prior reference was prior art by another in the face

of a declaration by the applicant that he was the sole inventor of the subject matter

in a cited article.  The PTAB had determined that a declaration alone was insufficient

and explained that disclaiming affidavits from the other co-authors of the reference

were required to corroborate the applicant's testimony.  The CCPA held that such

corroboration was not needed and that the inventor's "sworn statements" were

sufficient.  *Id.* at 455-456.

Likewise, the PTAB has determined in *ex parte* appeals of rejections of patent

applications that an unequivocal declaration from an inventor explaining that he was

the sole inventor of cited portions of prior art was sufficient to remove the reference

as prior art.  For example, the PTAB removed a reference as 102(e) prior art based

only on an unequivocal declaration, explaining "where the applicant is one of the

co-authors of a publication cited against his or her application, the rejection may be

overcome by filing a declaration under 37 CFR § 1.132 establishing that the article

is describing applicant's own work." *Ex Parte Morishita*, APPEAL 2012-010987,

2014 WL 5490491, at *5 (P.T.A.B. Oct. 9, 2014).  Similarly, in another *ex parte*

appeal, the PTAB accepted an unequivocal declaration, explaining, "[a]n

uncontradicted 'unequivocal statement' from the applicant regarding the subject

matter disclosed in an article, patent, or published application will be accepted as establishing inventorship." *Ex Parte John H. Griffin*, APPEAL 2013-000201, 2015 WL 5999262, at *4 (P.T.A.B. Sept. 28, 2015). Importantly, the PTAB went on to explain "[a]lthough a statement by Appellants may not be sufficient where there is evidence to the contrary, in the instant situation, the Examiner does not provide any evidence to the contrary." *Id.*

It is important to note that all of the above cases – *DeBaun, Katz, Morishita* and *Griffin* – involved *ex parte* appeals of rejections of patent applications. Likewise, the cited sections of the M.P.E.P. guide prosecution of patent applications. In those circumstances, the issue of whether a reference was 102(e) prior art is determined based on the "entirety of the record," without either the Patent Office or the applicant having a specific burden. *Kumar*, 418 F.3d at 1366. That is different than the present case, in which Volkswagen bears the ultimate burden to prove that the '558 Patent is 102(e) prior art.

*DeBaun, Katz, Morishita* and *Griffin* and old and new versions of the M.P.E.P. all state that an unequivocal, uncontradicted declaration are sufficient to remove a reference as 102(e) prior art. Accordingly, the same evidence – an unequivocal, uncontradicted declaration – should surely be sufficient to meet EmeraChem's burden to "produce evidence" that shows the '558 Patent should be removed as prior

art.  As such, the burden shifted to Volkswagen "to prove" that the '558 Patent actually is prior art.

Nevertheless, as noted above, Volkswagen did not cite <u>any</u> evidence to attempt to contradict Campbell's declaration.  Appx0346-0348.  It did not even cross-examine Campbell.  Appx0028.  For those reasons alone, Volkswagen failed to meet its burden to prove that the '558 Patent is prior art.

Also, Volkswagen did not cite any *inter partes* cases where a declaration was found to be insufficient to remove a reference asserted to be 102(e) prior art.  Instead, Volkswagen explained that in the *DeBaun* case, the declarant submitted a drawing he prepared as an exhibit to his declaration and therefore corroborated his declaration.  Appx0348. Volkswagen then cited a PTAB decision on an *ex parte* appeal – *Ex Parte Ethicon, Inc.*, APPEAL 2012-005275, 2013 WL 3356870, at *6 (P.T.A.B. June 12, 2013) – and asserted that *Ethicon* held that a declaration alone is insufficient and it must be accompanied by corroborating evidence.  *Id.*  However, that is not what the PTAB held in *Ethicon*.  Rather, the PTAB explained that "we are unable to find that applicant has made an 'unequivocal statement' that Erneta is the sole inventor of the subject matter of Erneta Claim 2 and 13."  *Ethicon*, 2013 WL 3356870 at *6.  Erneta's claims 2 and 13 had been cited against the subject application, but the submitted declaration only stated that Erneta was the inventor of the subject matter of *claim 1*.  *Id.* at *3, 5.  Because the declaration did not address

all cited subject matter, it was insufficient.  Accordingly, *Ethicon* merely held that the submitted declaration was insufficient because it did not unequivocally state that the declarant invented all cited subject matter.  The *Ethicon* Board also noted that no additional evidence was submitted that may have remedied the failure in the submitted declaration. *Id.* at *6.  The *Ethicon* Board did not hold that corroborating evidence is required when there is a sufficient declaration.

In the portion of the Final Written Decision concerning the '558 Patent, the PTAB initially notes that it draws no adverse inference from Volkswagen's election not to cross-examine Campbell, citing *Cabilly v. Boss*, 55 USPQ2d 1238, 1249 (BPAI 1998).  Appx0028.  However, in the *Cabilly* case, the PTAB stated that Boss – the senior party in an interference (i.e. the party <u>without</u> the burden of proof – *see Id.* at 1246) was not required to cross-examine a declarant because the "[s]enior party has the right to stand on its position that junior party has failed to make its case." *Id.* The present case involves the exact opposition situation – Volkswagen bears the burden of proof.  Volkswagen has the burden to prove that the '558 Patent is prior art in view of the evidence presented by EmeraChem.  If Volkswagen believed the Campbell testimony was incorrect or inaccurate in some manner, it should have cross-examined Campbell concerning his testimony.  Volkswagen's failure to present any cross-examination testimony, or even take Campbell's deposition to

attempt to obtain helpful testimony, should certainly weigh against a finding that Volkswagen had met its burden.

The PTAB then determined that EmeraChem "failed to carry its burden of production" because the PTAB "decline[s] to credit the Campbell testimony." Appx0032. In deciding to give Campbell's testimony no weight, the PTAB cited three factors – "(1) the time period between events and trial, (2) the interest of the witness, and (3) the absence of contemporary documentary evidence." Appx0031. In asserting that these factors are relevant, the PTAB cites two Federal Circuit cases – *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1371 (Fed Cir. 1998) and *Sandt Tech., Ltd. v. Resco Metal and Plastics Corp.*, 264 F.3d 1344, 1351 (Fed. Cir. 2001). However, those cases dealt with a substantially different situation, in which an inventor provides oral testimony only to show conception and reduction to practice prior to the priority date of the prior art. As explained by the *Woodland* court, "[t]hroughout the history of the determination of patent rights, oral testimony by an alleged inventor asserting priority over a patentee's rights is regarded with skepticism, and as a result, such inventor testimony must be supported by some type of corroborating evidence." *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1371 (Fed. Cir. 1998).

The present situation can be distinguished from the *Woodland* and *Sandt* situation where oral testimony of conception and reduction to practice must be

- 31 -

corroborated. Here, conception and reduction to practice are not at issue. *Debaun*, 687 F.2d at 463. The filing of the application for the '558 Patent is a constructive reduction to practice, "which inures to the [declarant's] benefit as one of the named inventors." *Id.* The '558 Patent itself serves as documentary evidence of conception and reduction to practice. As such, the Federal Circuit's admonitions in the PTAB's cited cases concerning inventor testimony are not relevant.

Additionally, in choosing to give no weight to Campbell's testimony, the PTAB attempted to differentiate the present case from *DeBaun* and *Griffin* by explaining that in those cases the submitted declarations included supporting evidence. The PTAB explained that in *DeBaun*, the declarant attached a drawing that he gave to patent counsel as evidence. Appx0031. However, the *DeBaun* decision only specifically cited the "unequivocal declaration" as being sufficient. *Debaun*, 687 F.2d at 463.

The PTAB explained that in *Griffin*, the prior art paper acknowledged the declarant for providing experimental material and for providing "stimulating discussions." Appx0032-0033. As such, this apparently corroborated the declarant's testimony that he was an inventor of the subject matter of the prior art paper in *Griffin*. However, it is unclear how this differs from the present situation. Of course, there is no acknowledgement statement that implies Campbell is an inventor of the '558 Patent. Here, there is something better. Campbell is providing

testimony that he invented subject matter disclosed in another patent <u>on which he was named a co-inventor</u>. The fact that Campbell was named as one of the inventors of the '558 Patent clearly corroborates his declaration testimony that he invented specific portions of the '558 Patent. In fact, the PTAB has specifically cited the fact that a declarant is listed as a co-inventor on the asserted prior art to serve as corroborating evidence. *Ex Parte Boris Rubinsky*, APPEAL 2012-012093, 2015 WL 4640300, at *4 (P.T.A.B. July 28, 2015) (explained by the PTAB in declining to accept a declaration due to the contradictory evidence that the declarant was <u>not</u> listed as the inventor on the prior art patent). It should also be noted that the '758 Patent prosecution history shows that one of the '558 Patent inventors – Robert Danziger - was involved in the '758 Patent prosecution (Appx0444), but did not list himself as an inventor, thus showing that he did not believe himself to be the inventor of subject matter included in claims in both the '558 Patent and '758 Patent. This further corroborates Campbell's testimony.

Put simply, the PTAB is simply wrong in asserting that an unequivocal declaration, by itself, is insufficient to remove as 102(e) prior art a prior patent listing the declarant as a co-inventor. An unequivocal declaration without any other documentary evidence was found sufficient in *Katz* and *Morishita* and the old and current versions of the M.P.E.P. state that an unequivocal declaration alone should be sufficient. Appellant believes the *Griffin* Board explained the test correctly - "An

uncontradicted 'unequivocal statement' from the applicant regarding the subject matter disclosed in an article, patent, or published application will be accepted as establishing inventorship. … Although a statement by Appellants may not be sufficient where there is evidence to the contrary, in the instant situation, the Examiner does not provide any evidence to the contrary." *Griffin*, 2015 WL 5999262, at *4. Just as in *Griffin,* there was an "uncontradicted unequivocal statement" showing that the portions of the '558 cited against claims 1 and 13 were not by another and therefore did not constitute 102(e) prior art. Volkswagen submitted no evidence to the contrary. Therefore, the '558 Patent should have been removed as prior art against claims 1 and 13.

In its ruling on the '558 Patent issue, it is apparent that the Board improperly shifted the ultimate burden to EmeraChem to prove that the '558 Patent was not prior art. EmeraChem's only burden should have been to provide "arguments and evidence" to show that the '558 Patent was not prior art. *Dynamic Drinkware,* 800 F.3d at 1379-1380. EmeraChem clearly met that burden in the form of Campbell's unequivocal testimony and supporting argument. The burden should have then shifted to Volkswagen to "prove" that the '558 Patent was prior art in view of that evidence. *Id*. Volkswagen did not provide any evidence to contradict Campbell's testimony and thus did not meet its burden.

The fact that the PTAB improperly placed the ultimate burden on EmeraChem is clear from its attempt to differentiate *Griffin*, where the PTAB states the following (Appx0033):

> [I]mportantly, there are significant differences between the ex parte *Griffin* proceeding and an *inter partes* review proceeding. In an ex parte proceeding the PTO may accept an unequivocal statement of an application. MPEP § 716.10. An ex parte proceeding is not adversarial. On the other hand, an *inter partes* review trial is by definition an *inter partes* adversarial proceeding in which a petitioner does not have to accept a non-corroborated allegation of inventorship.

The PTAB correctly states that there are significant differences between *ex parte* proceedings and *inter partes* review proceedings.  However, the PTAB is completely incorrect on what those differences are.  The PTAB suggests that the <u>patent owner</u> carries a higher burden in *inter partes* proceedings, explaining that the "petitioner does not have to accept a non-corroborated allegation of inventorship."  This is wrong.  As explained above, in *ex parte* proceedings, the burden dissolves after the patent applicant puts on its proof and the decision is made on the entirety of the evidence. *Kumar*, 418 F.3d at 1366.  However, in *inter partes* review, the patent owner has a presumption of validity and therefore the petitioner has the ultimate burden of proof. *Dynamic Drinkware,* 800 F.3d at 1378.  As such, the scales are titled more in patent owner's favor in an *inter partes* review as compared to patent application prosecution.  The PTAB improperly states that the opposite is true.  The

PTAB's placement of the ultimate burden to prove that the '558 Patent is not prior art on EmeraChem was improper and constitutes legal error that warrants reversal.

## C. The PTAB Lacked Authority to Review Claims 3, 16, and 20 on Grounds Not Identified in the Petition or the Institution Decision

### i.     The Federal Circuit has jurisdiction to consider this issue

First, before addressing the substantive question of whether the PTAB had authority to render a final decision based on grounds not identified in the Petition, the Court must determine whether it has jurisdiction to determine this issue.  In this regard, several Federal Circuit appeals have been filed concerning whether the PTAB has the authority to institute *inter partes* review based on grounds not raised in an appeal.   However, the institution issue in those appeals has not been substantively decided by the Federal Circuit due to 35 U.S.C. § 314(d), which explains that "[t]he determination by the Director *whether to institute* an inter partes review shall be final and nonappealable." (emphasis added).  Based on this statute, the Federal Circuit and the Supreme Court have determined that, in most cases, courts are precluded from reviewing institution decisions and therefore have no opportunity to address such decisions. *Cuozzo Speed Technologies, LLC v. Lee*, 136 S.Ct. 2131, 2141-42 (2016).

In the present appeal, EmeraChem is not challenging the authority of the PTAB to institute the review proceeding.  Rather, EmeraChem is challenging the PTAB's

authority to issue a final decision based on arguments not previously raised in the proceeding. "Section 314(d) does not prevent [the Federal Circuit] from hearing a challenge to the authority of the Board to issue a final decision." *Ethicon Endo-Surgery, Inc. v. Covidien LP*, 812 F.3d 1023 (Fed. Cir. 2016).

In this regard, as noted above, claims 3, 16, and 20 were found by the Board to be unpatentable in the Final Written Decision based on an assertion that the limitations in the claim were disclosed by Stiles. However, the Institution Decision instituted review of claims 3, 16, and 20 based only on an assertion that the limitations in the claims were disclosed by Saito. As such, EmeraChem is not challenging the decision to institute, but rather the final decision. Accordingly, this Court may consider the present issue.

ii.   IPR is an adjudicatory trial, not an examinational proceeding

With the AIA, Congress intended to "convert[] inter partes reexamination from an examinational to an adjudicative proceeding and rename[] the proceeding 'inter partes review.'" H.R. Rep. No. 112-98, pt. 1, at 46-48 (2011). While couched as a "conversion" and bearing some superficial procedural similarity to *inter partes* reexamination, IPR is based on a fundamentally different premise – it is an adjudicatory trial before the PTAB, not an examinational proceeding before an examiner. Further, unlike *inter partes* reexamination, IPR provides for discovery and depositions of declarants, grants the patent owner only a single, significantly limited

opportunity to amend the claims or add new claims, and allows parties to terminate the proceeding based on settlement. 35 U.S.C. §§ 316, 317.

A brief overview of *inter partes* reexamination and IPR explicates the stark contrast between the proceedings:

On November 29, 1999, the American Inventors Protection Act amended the reexamination statute to provide an *inter partes* option. AIPA Public Law 106-113; 35 U.S.C. §§ 311-318 (1999). Under this option, a third party requester was permitted to file a request for reexamination alleging a substantial new question of patentability for at least one claim of an issued patent. 35 U.S.C. § 311 (1999). An examiner in the Central Reexamination Unit would review the request and determine whether it should be granted. M.P.E.P. § 2633 (Rev. 7, July 2008). If the request was granted, the examiner issued a first Office action setting forth the grounds on which the reexamination would proceed. *Id*. The patent owner was permitted to file a response to the first Office action, including amending the granted claims and adding new claims, and the requestor was permitted to file written comments addressing the first Office action and the patent owner's response. 35 U.S.C. § 314 (1999). This cycle, action-response-comment, would repeat until the examiner issued an Office action closing prosecution. 37 C.F.R. § 1.949 (old). Upon issuance of the Office action closing prosecution, the patent owner and/or the requester were permitted to appeal the examiner's action to the Board of Patent Appeals and Interferences (now

the PTAB). 35 U.S.C. § 315 (1999). Thus, *inter partes* reexamination was substantially similar to examination of a patent application, but for the participation of the requestor.

Notably, in *inter partes* reexamination, the examiner was not limited to issues raised by the requester and was free to, at any time, perform a prior art search and formulate a new rejection for any claim of the patent. *Belkin*, 696 F.3d at 1383; M.P.E.P. § 2658 (Rev. 7, July 2008). In *Belkin*, the Court held that under 35 U.S.C. § 303(a), "the scope of reexamination may encompass those issues that raise a substantial new question of patentability, whether proposed by the requester or the Director, but, unless it is raised by the Director on his own initiative, it only includes issues of patentability raised in the request under § 311 that the Director has determined raise such an issue." *Belkin*, 696 F.3d at 1383. Thus, 35 U.S.C. § 303(a) gave the PTO broad discretionary powers to institute reexamination on any claims on any grounds.

IPR is a completely different animal.

An IPR is a trial – "a contested case instituted by the Board based upon a petition." 37 C.F.R. § 42.100(a); 37 C.F.R. § 42.2 (defining "trial"). Patent interferences, formerly administered under part 42 of title 37, are not "trials." 37 C.F.R § 42.2 (definition of "trial"). Similarly, reexaminations, administered under part 1 of title 37, are not "trials."

An IPR is presided over from start to finish by a panel of at least three administrative patent judges of the PTAB. 35 U.S.C. § 6(c). Examiners do not have any role in IPR, and there is no law or regulation allowing the PTAB to perform examinational actions, such as searching for prior art or formulating grounds of rejection.

An IPR is initiated only when "a person who is not the owner of the patent" (35 U.S.C. § 311) files a detailed petition that, *inter alia*, identifies with particularity, "the grounds on which the challenge to each claim is based, and the evidence that supports the grounds for the challenge to each claim." 35 U.S.C. § 312(a)(3). In particular, for each challenged claim, the petition must include a statement identifying, *inter alia*, "[t]he specific statutory grounds under 35 U.S.C. 102 or 103 on which the challenge to the claim is based" and "where each element of the claim is found in the prior art patents or printed publications relied upon." 37 C.F.R. § 42.104(b)(2), (5). During the March 2011 debates on the AIA, Senator Kyl noted that, "by requiring petitioners to tie their challenges to particular validity arguments against particular claims, the new threshold [reasonable-likelihood-of-success] will prevent challenges from 'mushrooming' after the review is instituted into additional arguments employing other prior art to attacking other claims." 157 Cong. Rec. at S1376 (daily ed. Mar. 8, 2011); *see also id.* at S1041–42 (daily ed. Mar. 1, 2011) (statement of Sen. Kyl).

iii.    <u>The PTAB did not have the authority to create a new ground of rejection for a claim in an IPR</u>

The statutory language requires an IPR petition to identify specific grounds of alleged unpatentability. A petition for IPR must "identify, in writing and with particularity, each claim challenged, the grounds on which the challenge to each claim is based, and the evidence that supports the grounds for the challenge to each claim." 35 U.S.C. § 315(a)(3). The Federal Circuit has previously explained that "[i]t is of the utmost importance that petitioners in the IPR proceedings adhere to th[is] requirement." *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016). In fact, petitioners are not allowed to introduce issues not raised in the initial petition subsequently in the proceeding and neither this Court nor the PTAB should consider reply briefs from petitioners that introduce new issues. *Id.* "Unlike district court litigation—where parties have greater freedom to revise and develop their arguments over time and in response to newly discovered material—the expedited nature of IPRs bring with it an obligation for petitioners to make their case in their petition to institute. While the Board's requirements are strict ones, they are requirements of which petitioners are aware when they seek to institute an IPR." *Id*.

Just as petitioners are not allowed to raise issues not argued in the Reply, the PTAB is not allowed to raise issues that are not raised in the Petition, especially if the patent owner is not provided with an opportunity to respond. In fact, the Federal

Circuit recently addressed this exact issue in *Magnum Oil Tools*, 2016 WL 3974202, at *10, explaining:

> [The IPR system] is predicated on a petition followed by a trial in which the petitioner bears the burden of proof. Given that framework, we find no support for the PTO's position that the Board is free to adopt arguments on behalf of petitioners that could have been, but were not, raised by the petitioner during an IPR. Instead, the Board must base its decision on arguments that were advanced by a party, and to which the opposing party was given a chance to respond. *SAS Inst., Inc. v. ComplementSoft, LLC*, No. 2015-1347, —— F.3d ——, ——, 2016 WL 3213103, at *7, 2016 U.S. App. LEXIS 10508, at *20–21 (Fed. Cir. June 10, 2016) ("An agency may not change theories in midstream without giving respondents reasonable notice of the change and the opportunity to present argument under the new theory.") (interpreting 5 U.S.C. § 554(b)(3)) (quoting *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1080 (Fed. Cir. 2015) (internal quotations omitted)). Here, "[i]t was [petitioner's] burden to demonstrate both 'that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.'" *Intelligent Bio–Sys., Inc. v. Illumina Cambridge, Ltd.*, 821 F.3d 1359, 1367-68 (Fed. Cir. 2016) (citing, *inter alia*, *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed. Cir. 2012)). Thus, while the PTO has broad authority to establish procedures for revisiting earlier-granted patents in IPRs, that authority is not so broad that it allows the PTO to raise, address, and decide unpatentability theories never presented by the petitioner and not supported by record evidence.

With this framework in mind, as explained above, Volkswagen's Petition challenged claims 3, 16, and 20 solely based on an assertion that the limitations of the claims were disclosed by Saito. Volkswagen made these assertions via claim charts. The PTAB welcomes this practice, explaining "while not required, a petitioner may file a claim chart to explain clearly and succinctly what the petitioner believes a claim means in comparison to something else, such as another claim, a

reference, or a specification." *See Office Patent Trial Practice Guide,* 77 Fed. Reg. 48,756, 48,764 (U.S. Patent & Trademark Office Aug. 14, 2012). Volkswagen's claim charts clearly and succinctly detailed the precise location in Saito where the limitations of claims 3, 16, and 20 were allegedly disclosed. *See* Appx0123, Appx0127, Appx0129. The claim charts did not include any citation to Stiles as disclosing elements of these claims. Stiles was submitted in other portions of the Petition only as allegedly providing motivation to combine the '558 Patent and Saito.

Subsequently, Stiles was not alleged to disclose the limitations of claims 3, 16, or 20 in the Institution Decision, Volkswagen's Reply, or at Oral Argument. The first time anyone asserted that Stiles disclosed the limitations of the claims was when the PTAB asserted for the first time in the Final Written Decision that the requirements of claims 3, 16, and 20 were all met by Stiles.

This obviously fails to provide reasonable notice to EmeraChem and deprived EmeraChem of any chance to respond. This is unfair and unreasonable. As noted above, the Federal Circuit has explained in reversing another IPR Final Written Decision that "the Board must base its decision on arguments that were advanced by a party, and to which the opposing party was given a chance to respond." *Magnum Oil Tools,* 2016 WL 3974202, at *10. The PTAB's Final Written Decision in this case did not follow this mandate. The PTAB does not have the authority "to raise, address, and decide unpatentability theories never presented by the petitioner." *Id.*

As such, the PTAB did not have the authority to determine the patentability of claims 3, 16, and 20 based on theories not presented in the Petition. Therefore, the PTAB's determination that claims 3, 16, and 20 are unpatentable must be reversed.

iv.    The PTAB improperly shifted the burden of persuasion to EmeraChem

In addition to lacking the authority to render the decision finding claims 3, 16, and 20 unpatentable, the PTAB also improperly shifted the burden of persuasion from Volkswagen to EmeraChem in its decision on claims 3, 16, and 20.

In the context of an IPR, the Petitioner bears the burden of establishing a *prima facie* case of invalidity. 35 U.S. Code § 316(e); *see Belden Inc. v. Berk-Tek LLC*, 2015 U.S. App. LEXIS 6312 at *19 (Fed. Cir. Apr. 17, 2015). For obviousness determinations, including the issue of "whether there would have been a motivation to combine the prior art," the Petitioner has both the burden of persuasion and the burden of production. *Magnum Oil Tools*, 2016 WL 3974202, at *6. Neither burden ever shifts to the patent owner. *Id.* If the petitioner fails to establish a *prima facie* case of invalidity, then the Patent Owner has no obligation to come forward with evidence or argument in rebuttal.

In the present case, the PTAB determined that claims 1 and 13 were obvious based on a combination of the '558 Patent and Saito. The PTAB then determined that dependent claims 3, 16, and 20 were obvious by citing to portions of Stiles. In doing so, the PTAB at least inherently determined that it was obvious to modify the

Saito regeneration method with aspects of the regeneration gas from Stiles. To reach this conclusion, the PTAB is required to determine that a person of ordinary skill in the art would have sought to combine Saito and Stiles. However, the PTAB's determination on this issue should only be based on assertions by the petitioner. *Magnum Oil Tools*, 2016 WL 3974202, at *10. As noted, it is "petitioner's burden to demonstrate both that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have a reasonable expectation of success in doing so." *Id*. (internal quotations and citations omitted). The petitioner must "articulate specific reasoning" as to why two references are properly combinable. *Id.* If the petitioner only provides conclusory statements in support of such an assertion, the PTAB <u>cannot</u> reach a determination that two references are properly combinable. *Id.* ("Because such conclusory statements cannot satisfy the petitioner's burden of demonstrating obviousness, the Board did not have sufficient evidence on which to base its legal conclusion of obviousness.")

In the present case, Volkswagen never argued that it would be proper to combine Saito and Stiles. Volkswagen made no statement whatsoever – not even a conclusory statement – suggesting that a skilled artisan would have been motivated to combine the teachings of Saito and Stiles to achieve the claimed invention, and that the skilled artisan would have a reasonable expectation of success in doing so.

Appx0114-0118.  Lacking such statements, Volkswagen clearly failed to meet its burden to show that Saito and Stiles are properly combinable.

Nevertheless, rather than requiring Volkswagen to prove obviousness and to prove that Saito and Stiles are properly combinable, the PTAB improperly placed the burden on EmeraChem to prove nonobviousness and to prove that the Saito and Stiles were not combinable.  In this regard, in finding claims 3, 16, and 20 unpatentable, the PTAB stated that portions of Stiles said to meet the limitations of claims 3, 16, and 20 had been "[o]verlooked, and not addressed by" EmeraChem. Appx0044-0045. However, it was not EmeraChem's burden to address Stiles.  That was Volkswagen's burden, and Volkswagen did not assert that Stiles met the limitations of the claims. EmeraChem had no reason to address arguments that were not put forward by Volkswagen.

Additionally, with regard to claims 16 and 20, the PTAB asserts that it would be obvious to combine components of the Stiles regeneration gas with the Saito regeneration gas.  In doing so, the PTAB states - "What is clear from the record is that regeneration gas can contain hydrogen, nitrogen, carbon dioxide, and water vapor per Stiles and hydrogen, ammonia, carbon monoxide, and hydrocarbons per Saito.  Selection of a particular gas has not been shown to be beyond the skill in this art." (emphasis added).  Appx0045.  However, it is not EmeraChem's burden to show that a combination of two references is beyond the skill in the art.  Rather, the

- 46 -

Federal Circuit has explained "it [is] petitioner's burden to demonstrate … that the skilled artisan would have a reasonable expectation of success" in combining two references. *Magnum Oil Tools*, 2016 WL 3974202, at *10. Here, Volkswagen did not assert that a person of skill in the art would have combined Saito and Stiles. The PTAB's shifting of the burden to EmeraChem to prove that Saito and Stiles were not combinable was in error.

The Federal Circuit has previously held that this precise issue created legal error in a PTAB decision concerning a reexamination proceeding. In *Rambus Inc. v. Rea*, 731 F.3d 1248, 1255 (Fed. Cir. 2013), the Court explained:

> The Board erroneously placed the burden on Rambus [the patent owner] to prove that its claims were not obvious. In reexamination proceedings, "a preponderance of the evidence must show nonpatentability before the PTO may reject the claims of a patent application." *Ethicon, Inc. v. Quigg,* 849 F.2d 1422, 1427 (Fed.Cir.1988); *see also In re Jung,* 637 F.3d 1356, 1365–66 (Fed.Cir.2011) (explaining that while "the applicant must identify to the Board what the examiner did wrong, ... the examiner retains the burden to show invalidity"). The Board instead concluded that "Rambus ha[d] not demonstrated that skilled artisans ... would not have been able to arrive at the broadly claimed invention." Board Opinion at 27; *see also id.* at 24 (holding that "Rambus fail[ed] to present evidence that skilled artisans would have been unable to modify" iAPX to achieve the claimed invention). That was legal error.

Likewise, the PTAB's determination that EmeraChem failed to show that the regeneration gases of Saito and Stiles was not beyond the skill in the art constitutes legal error. As such, the PTAB's ruling on claims 3, 16, and 20 must be reversed.

## VI.    CONCLUSION

For the foregoing reasons, the Court should reverse the PTAB's final written

decision cancelling claims 1-14 and 16-20.


Respectfully submitted,

Dated:  August 10, 2016

/s/ Michael J. Bradford/
Michael J. Bradford (Reg. No. 52,646)
LUEDEKA NEELY GROUP, P.C.
900 S. Gay Street, Suite 1504
P. O. Box 1871
Knoxville, TN  37901-1871
Tel: (865) 546-4305
Fax: (865) 523-4478
mbradford@luedeka.com

/s/ Jacobus C. Rasser/
Jacobus C. Rasser (Reg. No. 37,043)
Marras Amsterdam BV
Beethovenstraat 105 B
1077HX Amsterdam
The Netherlands
Tel: +31 (0)6 5245 2741
koosrasser@gmail.com

COUNSEL FOR APPELLANT
EMERACHEM HOLDINGS, LLC

# ADDENDUM

Trials@uspto.gov                                                           Paper  59
571-272-7822                                             Entered:  22 January 2016

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

VOLKSWAGEN GROUP OF AMERICA, INC.,
Petitioner,

v.

EMERACHEM HOLDINGS, LLC,
Patent Owner.
_____

Case IPR2014-01558
Patent 5,599,758

Before FRED E. McKELVEY, JAMES T. MOORE, and
SHERIDAN K. SNEDDEN, *Administrative Patent Judges*.

McKELVEY, *Administrative Patent Judge*.

DECISION
Final Written Decision
*35 U.S.C. 318(a)*

I.  Introduction

Pending before the Board is entry of a Final Written Decision.

A Petition was filed on 30 September 2014.  Paper 3.

An *inter partes* review trial was ordered on 16 March 2015.  Paper 19,
*reh'g denied*, Paper 22 (7 April 2015).

Patent Owner timely filed an Opposition.  Paper 29.

IPR2014-01558
Patent 5,599,758

Petitioner timely filed a Reply.  Paper 40.

Patent Owner timely filed a motion to exclude.  Paper 45.

Petitioner timely opposed.  Paper 50.

Petitioner timely filed a motion to exclude.  Paper 47.  Patent Owner has opposed.  Paper 52.  Petitioner has replied.  Paper 54.

## II.  Background

### A.  The Parties

Petitioner is Volkswagen Group of America, Inc.  Paper 3, page 1.

Patent Owner is EmeraChem Holdings, LLC.  Paper 6, page 2.

### B.  Involved Patent

The involved patent is expired U.S. Patent 5,599,758 ("the '758 patent") issued 4 February 1997, based on an application filed 23 December 1994.  Ex. 1001A.

A description of the '758 patent is set out below.

### C.  Litigation

The '758 patent is involved in litigation, *viz.*, *EmeraChem Holdings, LLC v. Volkswagen Group of America, Inc., Volkswagen AG, and Volkswagen Group of America Chattanooga Operations, LLC*, No. 14-cv-132-PLR-HBG (E.D. Tenn. filed Mar. 31, 2014).  Paper 3, page 1; Paper 14, page 1.

An amended complaint was served on defendant Volkswagen Group of America Chattanooga Operations, LLC, on 6 November 2014.  Paper 14, page 2.

An amended complaint was served on defendant Volkswagen Group of America, Inc., on 6 November 2014.  Paper 14, page 1.

IPR2014-01558
Patent 5,599,758

An amended complaint was served on defendant Volkswagen AG on 8 January 2015.  *Id.*

## D.  Evidence Relied Upon

Patent Owner relies on the following prior art, listed in numerical order by exhibit number:

| Name | Exhibit No. | Description | Date |
|---|---|---|---|
| Campbell et al. "Campbell" | 1003A | U.S. Patent 5,451,558[1] | 10 Sept. 1995 filed 4 Feb. 1994 |
| Hirota et al. "Hirota" | 1006A | U.S. Patent 5,406,790 | 18 Apr. 1995 filed 2 Dec. 1993 |
| Takeshima et al. "Takeshima" | 1007A | European Patent Application 0 560 991 A1 | 22 Sept. 1993 |
| Saito et al. "Saito" | 1008B | Japanese Patent Application 62-106826 | 18 May 1987 |
| Stiles et al. "Stiles" | 1009A | U.S. Patent No. 5,362,463 | 8 Nov. 1994 |

Takeshima and Saito are prior art under 35 U.S.C. § 102(b).

Campbell and Hirota are prior art under 35 U.S.C. § 102(e).

Stiles is prior art under 35 U.S.C. § 102(a).

As will become apparent, Patent Owner attempts to remove Campbell as prior art, but not Hirota or Stiles.

## E.  Grounds

Claims 1–20 appear in the '758 patent.

---

[1]  Campbell is the patent involved in IPR2014-01555.

IPR2014-01558
Patent 5,599,758

An *inter partes* review trial was instituted on the following claims and prior art (I means instituted).

| Claim | Hirota § 102(e) Ground 1 | Takeshima § 102(b) Ground 2 | Saito § 102(b) Ground 3 | Campbell Hirota Saito Stiles § 103(a) Ground 4 |
|---|---|---|---|---|
| 1 | I | I | I | I |
| 2 | I | I | I | I |
| 3 | | | I | I |
| 4 | I | I | I | I |
| 5 | I | | I | I |
| 6 | I | | I | I |
| 7 | | | I | I |
| 8 | | | I | I |
| 9 | I | I | I | I |
| 10 | | | | I |
| 11 | I | I | I | I |
| 12 | I | I | I | I |
| 13 | | | I | I |
| 14 | | | I | I |
| 16 | | | I | I |
| 17 | | | | I |
| 18 | | | | I |
| 19 | | | | I |
| 20 | | | I | I |

Petitioner has not challenged claim 15 of the '758 patent.

### F. Oral Argument

Oral argument was held on 23 November 2015.

Prior to oral argument, and based on the Petition, Opposition, and Reply, the Board invited the parties to address specific issues at oral argument. Paper 53, pages 6–8.

4

IPR2014-01558
Patent 5,599,758

A transcript of oral argument has been placed in the record.  Paper 58.

Some of the oral argument presented by both parties was not consistent with oral argument procedure applicable before the Board.  In particular, arguments were made that were not based on arguments in the Petition, Opposition, or Reply.  In addition, explanations were proffered that are not supported by evidence in the record or arguments previously made in the Petition, Opposition, or Reply.  *See*, *e.g.*, Transcript of Oral Argument, Paper 58, page 14:5–22.

Oral argument is governed in part by 37 C.F.R. § 42.70(a) (first sentence) (italics added):

> (a) A party may request oral argument *on an issue raised in a paper* at a time set by the Board.

The Trial Practice Guidelines advise as follows:

> A party may rely upon evidence that has been previously submitted in the proceeding and *may only present arguments relied upon in the papers previously submitted. No new evidence or arguments may be presented at the oral argument*.

Office Patent Trial Practice Guide, 77 Fed. Reg. 48756, 48768 (col. 2) (Aug. 14, 2012) (italics added).

The rationale in support of the Rule and Guideline is fundamental fairness to an opponent.  37 C.F.R. § 42.1(b) (Part 42 "shall be construed to secure the just, speedy, and inexpensive resolution of every proceeding.") It is not just to an opponent for a party to raise an argument not based on the Petition, Opposition, or Reply, or to discuss evidence not in the record. Why?  There is no meaningful opportunity for the opponent to rebut the argument or address the evidence.  Likewise, the Board is at a disadvantage

5

IPR2014-01558
Patent 5,599,758

because judges do not prepare for oral argument based on arguments and evidence not present in the record.

To the extent that arguments and discussions took place at oral argument in this case contrary to the principles set out above, those arguments and discussions have not been considered in rendering a decision on the merits and are not considered to be properly in the record.

### G.  The '758 Patent

#### 1.  Claim 1

The invention is generally understood from claim 1 of the '758 patent, which reads [some indentation and matter in brackets added]:

A method of regenerating a devitalized absorber having nitrogen oxides absorbed therein or thereon, said method comprising the steps of:

[A] providing a stream of regenerating gas comprising [A1] a reducing gas, said reducing gas having an effective amount for removing said nitrogen oxides from said devitalized absorber, and [A2] an inert carrier gas;  and

[B] passing said stream of regenerating gas comprising [B1] an inert carrier gas and [B2] a component selected from the group consisting of hydrogen, carbon monoxide and mixtures thereof over said devitalized absorber comprising

[1] an alumina support with

[2] a platinum coating thereon and having nitrogen oxides absorbed therein or thereon for

[C1] an effective time,

[C2] at an effective temperature and

6

IPR2014-01558
Patent 5,599,758

[C3] at an effective space velocity

[D] to remove said nitrogen oxides from said devitalized absorber to form a regenerated absorber.

Ex. 1001A, 9:28–44.

## 2.  Details of the Invention

According to the '758 patent, "[t]he principal component of the gaseous stream is an inert carrier gas such as nitrogen, helium, argon, or steam." Ex. 1001A, 2:60–62.

Further according to the '758 patent:

The regeneration gas comprises a reactant gas or mixture of reactant gases along with a carrier gas or carrier gas mixture. The reactant gases are reactive reducing agents to convert the oxidized forms of the absorber made in the absorption step. The preferred reactants gases are carbon monoxide or hydrogen or combinations of carbon monoxide and hydrogen. The reactant gases make up about 500 ppm to 10 percent of the regeneration gas; the remainder of the regeneration gas is the carrier gas mixture.

Ex. 1001A, 2:66–3:7.

## III.  Analysis—Ground 1 (Hirota)

The principal issue with respect to Ground 1 is whether Hirota describes an inert carrier gas. Petitioner says "yes" and Patent Owner says "no."

The '758 patent contains the following discussion:

The regeneration gas comprises a reactant gas or mixture of reactant gases along with a carrier gas or carrier gas mixture. The reactant gases are reactive reducing agents to convert the oxidized forms of the absorber made in the

7

IPR2014-01558
Patent 5,599,758

absorption step. The preferred reactants gases are carbon monoxide or hydrogen or combinations of carbon monoxide and hydrogen. The reactant gases make up about 500 ppm to 10 percent of the regeneration gas; the remainder of the regeneration gas is the carrier gas mixture.

The carrier gas may comprise principally nitrogen or steam, for example, preferred 50 percent or more nitrogen and may have smaller concentrations of carbon dioxide and steam or 50 percent or more steam and may have smaller concentrations of nitrogen and carbon dioxide. Nitrogen in high concentrations of about 50% to about 80% provides an excellent carrier for the reductants. Steam is also a good carrier in concentrations of 30% to 98% with the balance being nitrogen.

*The regeneration gas is substantially oxygen free, although up to one percent oxygen may be present without significant negative effects.*

Ex. 1001A, col. 2:66–col. 3:18 (italics added).

The patent involved in IPR2014-01556, U.S. Patent 5,953,911, ("the '911 patent") contains a similar discussion. IPR2014-01556, Ex. 1001A, col. 3:6–30.

In our Final Written Decision in IPR2014-01556, we interpreted similar language based on a similar specification to limit the amount of oxygen in the regeneration gas to no more than one percent. IPR2014-01556, Paper 57, pages 15–16.

Based on arguments made in IPR2014-01556, that are essentially the same arguments made in this IPR, we held that Petitioner had not established that Hirota's corresponding regeneration gas had an oxygen amount of no more than up to one percent oxygen.

8

IPR2014-01558
Patent 5,599,758

We see no need to repeat that discussion here, and adopt it as written therein.

Petitioner has failed to establish that Hirota describes a regeneration gas falling within the scope of the regeneration gas of claim 1 of the '758 patent.

Accordingly, Petitioner has failed to satisfy its burden of proving by a preponderance of the evidence that the subject matter of claim 1 of the '758 patent is anticipated by Hirota.

Claims 2, 4–6, 9, 11, and 12 depend from claim 1 and therefore likewise are not anticipated.

IV.  Analysis—Ground 2 (Takeshima)

A.  Background

Petitioner maintains that Takeshima (Ex. 1007A) anticipates independent claim 1 and dependent claims 2, 4, 9, 11, and 12 of the '758 patent.  Paper 3, pages 12 and 28–37.

Patent Owner disagrees.  Paper 29, pages 12–14.[2]

In IPR2014-01555, we found that Petitioner failed to establish that claims involved in that IPR were anticipated by Takeshima.  In particular, we found that Petitioner failed to establish by a preponderance of the evidence that Takeshima describes  a

---

[2]  In support of its argument, Patent Owner refers to an Inui reference. Ex. 1007B in IPR2014-01555.  The Inui reference was not made of record in this IPR.  Inui is not addressed in Petitioner's Reply.  Incorporation by reference in a first IPR to evidence is a second IPR is not permitted. Accordingly, neither the Inui reference nor the argument on page13:6 through page 14:8 of Patent Owner's Opposition have been considered.

9

IPR2014-01558
Patent 5,599,758

"component being *intimately and entirely coated* with an absorber selected from a hydroxide, carbonate, bicarbonate or mixtures thereof of an alkali or alkaline earth or mixtures thereof" as required by claim 1 of the patent involved in the IPR.  IPR2014-01555, Paper 50, page 12.

### B.  Facts

The challenged claims of the involved '758 patent in this IPR do not contain an "intimately and entirely coated" limitation.

Hence, the evaluation here of anticipation is on a different basis than that in IPR2014-01555, i.e., whether Takeshima describes, in the words of claim 1, "an alumina support with a platinum coating."

According to Patent Owner, "Takeshima does not disclose a method involving a material including an alumina support with a platinum *coating* thereon."  Paper 29, page 12:13–14 (italics added). Patent Owner therefore maintains that Petitioner has not established that Takeshima describes the limitation:

> [1]    an alumina support with

> [2]    a platinum *coating thereon* and having
>        nitrogen oxides absorbed therein or thereon

as set out in Part [B] of claim 1 as reproduced above.

In its claim chart, Petitioner explains how the limitation is said to be described by Takeshima:

IPR2014-01558
Patent 5,599,758

| Claim 1 coating limitation | Takeshima |
|---|---|
| passing . . . [a] stream of regenerating gas . . . over . . . [a] devitalized absorber comprising an alumina support with a platinum *coating* thereon . . . . | A method of regenerating a devitalized catalytic NO$_x$ absorbent comprising platinum and barium oxide *disposed* on an alumina carrier. <u>See</u> Ex.1007[A] at col. 2, ln. 10-14; col. 5, ln. 1-9, 24-30; col. 5, ln. 45 - col. 6, ln. 1; col. 6, ln. 24-42 |

Paper 3, page 34 (italics added).

We have not been directed to any discussion in the '758 patent describing what is meant by "a platinum coating thereon."  In fact the '758 patent itself talks in terms of platinum being "disposed" on the alumina support:

> In commonly assigned [Campbell] U.S. Pat. No. 5,451,558 [Ex. 1003A], *which is incorporated herein in its entirety*, a catalyst/absorber is described and consists of a support with an alumina washcoat *disposed* thereover, a platinum catalyst *disposed* on the washcoat, and with an alkali or alkaline earth carbonate or bicarbonate coating thereon, the carbonate coating being lithium, sodium, potassium or calcium carbonate.

Ex. 1001A, col. 1:55–2:3 (italics added).

Figure 1 of the incorporated by reference Campbell '558 patent is reproduced below:

IPR2014-01558
Patent 5,599,758



FIG. 1A

Depicted in Figure 1A of Campbell is a schematic drawing of a catalyst
absorber sphere for use in a process for making
the novel catalyst absorber of a preferred embodiment.

Ex. 1003A, col. 3:36–37.

According to Campbell '558, "FIG. la shows a spherical catalyst
absorber made up of an alumina sphere **10** with a platinum coating **12** and a
carbonate coating **14** thereon." Ex. 1003A, col. 4:67–col. 5:1. Campbell
'558 also mentions "platinum coated spheres." Ex. 1003A, col. 5:30–31.

We turn to Takeshima.

The relevant information as outlined in Petitioner's claim chart,
appears to be as follows (italics added):

| Takeshima | Description in Takeshima |
| --- | --- |
| Col. 2:10-14 | An object of the . . . invention is to provide an exhaust purification device which can efficiently absorb $NO_x$ without a complex construction of the exhaust system and can release the absorbed $NO_x$ according to need |
| Col. 5:1-9 | The NOx absorbent 18 in the casing 19 uses, for example, alumina as a *carrier*. On this carrier, at least one substance selected from alkali metals, for example, potassium K, sodium Na, lithium Li, and Cesium Cs; alkali earth metals, for example, barium |

12

IPR2014-01558
Patent 5,599,758

| | Ba and Calcium Ca; rare earth metals, for example lanthanum La and yttrium Y; and precious metals such as platinum Pt, is *carried*.<br><br>Note:  Absorbent 18 and casing 19 are shown in a portion of Takeshima Fig. 1:<br><br> |
|---|---|

Petitioner's witness, Dr. Robert J. Farrauto, in discussing Takeshima, does not address "coating" in his direct declaration testimony.  Ex. 1010A, ¶¶ 27–32.

In the Reply, Petitioner notes that the opposition is limited to arguing a lack of a description of a platinum coating.  Paper 40, page 7.

Patent Owner's witness, Dr. Mark Crocker, was of the opinion that "[w]hen a reference refers to a carrier, this does not indicate that the carrier is coated with the carried material."  Ex. 2004, ¶ 17.

Petitioner observes that the underlying basis for Dr. Crocker's ¶ 17 testimony is not identified.  Paper 40, page 8.

Nevertheless,  Dr. Crocker was cross-examined on the matter:

> Q. Okay.  So you just don't coat the whole thing with platinum? The -- I'm sorry. *You just don't coat the alumina support entirely with platinum?  It's the platinum atoms are dispersed?*
>
> A. *Correct.*

Q. And how widely are they dispersed on the alumina support?

A. Obviously, that depends on a number of factors. It depends on the platinum loading, it depends on the efficacy of the catalyst preparation method, and it depends upon the history of the catalyst, i.e., to the conditions to which its being exposed.

Q. Okay. And one of ordinary skill in the art can take all of those factors into account and determine the dispersion that should be used?

A. Well, one -- one aims for the highest dispersion possible when preparing the catalyst.

Q. Why is that?

A. In that way one makes the most efficient use of the supported platinum.

Q. Because platinum's expensive?

A. Platinum is expensive.

Q. So you want to use –

A. You want to use it as efficiently as possible.

Q. Is there some measure of dispersion or efficiency so that you can compare one dispersion rate, I guess would be the proper term, to another dispersion rate so that your bosses will make sure that you're making the most effective use of the expensive platinum?

A. Yes. As part of the standards procedure for characterizing a catalyst, one typically performs hydrogen chem esorption in which one essentially titrates the surface platinum atoms with hydrogen, and by measuring the

IPR2014-01558
Patent 5,599,758

amount of hydrogen taken up one gains an accurate measure of the number of exposed platinum atoms, and from that and knowing the platinum loading, one can calculate the dispersion.

Q. *So when you use the phrase that the "alumina support is coated with platinum," that doesn't mean that the entirety of the alumina is covered by platinum atoms, correct?*

A. *Exactly. In fact, as a chemist, I would typically not use the term "coated," but that is the language which is typically used in many patents.*

Q. And what is your understanding of the meaning of the word "coated" as it is used in those patents that you were referring to?

A. It depends on the context.  If one is talking about coating a wash coat onto a monolithic substrate, then I take that to mean covering the entirety of the monolith. *When it's talking about coating a catalyst wash coat with platinum, then I take that to mean depositing a certain amount of platinum on that wash coat.*

Ex. 1056, page 13:2 to page 15:2 (italics added).

Dr. Crocker further testified on cross-examination:

Q. Okay.  What do you understand the phrase "an alumina support with a platinum *coating* thereon" to mean?

A. I take that to mean an alumina support material onto which platinum has been *deposited*, but to my mind that does not imply that the platinum forms a *continuous* monolayer.

Ex. 1056, page 80:22 – page 81:1.

Dr. Crocker still further testified:

15

IPR2014-01558
Patent 5,599,758

> Q. Okay.  So with respect to Claim 1, when you're
> interpreting Claim 1 of the '758 patent to that effect, do
> you then apply the same meaning when looking at a prior
> art reference that has platinum deposited on a carrier?
>
> A. Yes, I do, because my chemical intuition tells me that
> one is never going to want to completely coat the surface
> of a carrier with a monolayer of platinum.

Ex. 1056, page 83:3–9.

On cross-examination, Dr. Crocker agreed that "carried" (the term used by Takeshima) would be understood as not wanting to completely coat the surface of a carrier with a monolayer of platinum.

### C.  Discussion

According to the Campbell patent, incorporated by reference into the involved '758 patent, Figure 1a of the Campbell patent describes a "preferred embodiment."  Ex. 1003A, col. 3:36–37.

Claim 1 of the '758 patent calls for "an alumina support with a platinum coating thereon."  Ex. 1001A, col. 9:39.

An embodiment described in the Campbell patent, incorporated by reference into the involved '758 patent, is "an alumina sphere **10** with a platinum coating **12** . . . thereon." Ex. 1003A, col. 4:68 through col. 5:1.[3]

Given that the language of claim 1 of the '758 is the same as the language describing the mentioned embodiment, we hold that the

---

[3]  We note that the '758 patent refers to other applications, said to be incorporated by reference.  These other applications, however, have not been made of record in this IPR.

16

IPR2014-01558
Patent 5,599,758

language "an alumina sphere with a platinum coating thereon" is best defined as one in which the platinum is intimately and entirely coating the alumina support, as shown in Figure 1a of the '758 patent.

There is tension between Dr. Crocker's cross-examination testimony and the description of "coating thereon" in the '758 patent when considered in light of the incorporated by reference Campbell '558 patent. So, at first blush, our claim interpretation may appear to be at odds with Dr. Crocker's cross-examination. Dr. Crocker nowhere explains his position vis-à-vis Figure 1 of the Campbell patent. Nor does Dr. Crocker meaningfully address the use of the word "disposed" as it appears in unchallenged claim 13 of the '758 patent. Ex. 1001A, col. 10:28.

Takeshima describes the platinum as "carried" on the alumina support. Ex. 1007A, col. 5:8–9. Dr. Crocker is of the opinion that carried does not mean forming a continuous layer, such as that shown in Figure 1a of the Campbell patent: "I take that to mean an alumina support material onto which platinum has been *deposited*, but to my mind that does not imply that the platinum forms a *continuous* monolayer." Ex. 1056, page 80:24 – page 81:1.

Takeshima does not explicitly describe an alumina support with a continuous layer of platinum coated thereon. Rather, Takeshima describes an alumina support with platinum carried thereon. We credit that part of Dr. Crocker's testimony discussing why a continuous layer of platinum is not described by Takeshima.

We also note that in its claim chart, Petitioner uses the word "disposed" which is the same word used in unchallenged claim 13 of

17

IPR2014-01558
Patent 5,599,758

the '758 patent.  In our view, "disposed thereon" is broader than "coating thereon."

For the reasons given, we find that Petitioner has failed to establish by a preponderance of the evidence that Takeshima describes "an alumina support with a platinum coating thereon" as recited in claim 1 of the '758 patent.  The platinum carried on an alumina support of Takeshima may be (1) coated thereon in a continuous form or (2) disposed thereon in a non-continuous form.  Since the record does not establish which of possibilities (1) or (2) is described by Takeshima, we find that Takeshima cannot anticipate.

Takeshima therefore does not anticipate claim 1 of the '758 patent.

Since the remaining challenged claims depend from claim 1, Petitioner has failed to establish anticipation with respect to those dependent claims.

## V.  Analysis—Ground 3 (Saito)

### A.  Background

Petitioner maintains that Saito (Ex. 1008B) anticipates claim 1–9, 11–14, 16 and 20 of the '758 patent.  Paper 3, pages 12 and 37–44.

Patent Owner disagrees.  Paper 29, pages 14–24.

### B.  Petition

According to Petitioner's claim chart (Paper 3, pages 40–41), reproduced in part below, claim 1 of the '758 patent is anticipated by Saito.

IPR2014-01558
Patent 5,599,758

| Claim Limitation | Saito |
|---|---|
| A method of regenerating a devitalized absorber having nitrogen oxides absorbed therein or thereon, said method comprising the steps of: | "A method of … reducing and removing the nitrogen oxide accumulated on the catalyst using a gaseous reducing agent, so as to regenerate the oxidative absorption capacity of the catalyst."  Ex. 1008[B] at p. 1. "1-a and 1-b are catalysts that oxidize and absorb NO~ …" (p. 3) |
| providing a stream of regenerating gas comprising a reducing gas, said reducing gas having an effective amount for removing said nitrogen oxides from said devitalized absorber, and an inert carrier gas; and | "Ordinary reducing agents such as hydrogen, … carbon monoxide, … and the like can be used…." Ex. 1008[B] at p. 4.  The reducing gas can be "diluted in an inert gas such as nitrogen." (p. 4). |

IPR2014-01558
Patent 5,599,758

| Claim Limitation | Saito |
|---|---|
| passing said stream of regenerating gas comprising an inert carrier gas and a component selected from the group consisting of hydrogen, carbon monoxide and mixtures thereof over said devitalized absorber comprising an alumina support with a platinum coating thereon and having nitrogen oxides absorbed therein or thereon for an effective time, at an effective temperature and at an effective space velocity to remove said nitrogen oxides from said devitalized absorber to form a regenerated absorber. | "[O]rdinary reducing agents such as hydrogen, … carbon monoxide, … and the like can be used…." Ex. 1008[B] at p. 4. The reducing gas can be "diluted in an inert gas such as nitrogen." (p. 4). Devitalized catalyst comprises platinum. This catalyst may be disposed on an alumina carrier. (pp. 3-4). When the $NO_x$ absorption efficiency of the catalyst has decreased, the $NO_x$ that had already accumulated on the catalyst is reduced and removed using the gaseous reducing agent so as to regenerate the oxidative absorption capacity of the catalyst. (p. 3). "[T]he reducing temperature is preferably 150 to 800° C, and in particular 200 to 700° C, the space velocity is a function of the concentration of the reducing agent, but the range of 10 to 100,000 $Hr^{-1}$ is suitable. There are no particular limits on the processing time, but in the range of 1 minute to 1 hour is preferred." (p. 4). |

The relevant part of the cited portion of Saito (Ex. 1008B) is as follows:

> [A] catalyst . . . [comprising] a metal, oxide or complex oxide of at least one element selected from the group of

IPR2014-01558
Patent 5,599,758

> manganese, iron, cobalt, nickel, copper, silver, zinc, chromium, molybdenum, tungsten, vanadium, niobium, tantalum, cerium, lanthanum, titanium, zirconium, aluminum, silicon, tin, lead, phosphorus, sulfur, alkaline earth metals comprising calcium, magnesium, strontium, and *barium*, alkali metals comprising lithium, sodium, potassium, rubidium, and cesium and precious metals comprising *platinum*, palladium, rhodium and ruthenium.

Ex. 1008B, renumbered page 1, col. 1 (emphasis added).

According to Petitioner:

> Saito discloses that the catalyst can comprise platinum and barium oxide.

> [S]aid catalyst comprises ***a metal, oxide or complex oxide of at least one element selected from the group of*** manganese, iron, cobalt, nickel, copper, silver, zinc, chromium, molybdenum, tungsten, vanadium, niobium, tantalum, cerium, lanthanum, titanium, zirconium, aluminum, silicon, tin, lead, phosphorus, sulfur, alkaline earth metals comprising calcium, magnesium, strontium, and ***barium,*** alkali metals comprising lithium, sodium, potassium, rubidium, and cesium and precious metals comprising ***platinum,*** palladium, rhodium and ruthenium.

Paper 3, pages 37–38 (emphasis in original); Ex. 1008B, page 1, col. 1.

As noted by Patent Owner, Dr. Farrauto does not appear to discuss Saito.  Paper 29, page 16.

## C.  Opposition

In opposition, Patent Owner relies on the direct Declaration testimony of Dr. Crocker:

> Saito does not specifically disclose a Pt-BaO absorbent ([Paper 3] . . ., p. 39).  Saito cites a catalyst comprising a metal, oxide or complex oxide of at least one element selected from a list of thirty-six elements (of which thirty-

21

IPR2014-01558
Patent 5,599,758

> four are metals or metalloids and two are non-metals) ([Ex.
> 1008B,] Saito, p. 1). Thus, thousands of different element
> combinations are possible (even when combining only two
> elements in the elemental or oxide form). The example
> given cites the use of a lanthanum-cobalt complex oxide
> ([Ex. 1008B,] Saito, p. 4).

Ex. 2004, ¶ 21.

No cross-examination relative to Dr. Crocker's ¶ 21 direct testimony has been called to our attention.

Patent Owner argues in its Opposition that there are too many possibilities described by Saito to establish anticipation. Accordingly, says Patent Owner, Saito does not describe a specific combination of platinum and barium oxide. Paper 29, pages 18–19. In effect, Patent Owner says there are too many "selections" needed to come up with the combination set out in claim 1. *Id*. at 18.

### D. Reply

Petitioner claims precedent is against Patent Owner's "selections" argument, citing *In re Petering*, 301 F.2d 676 (CCPA 1962) and *In re Schaumann*, 572 F.2d 312 (CCPA 1978), both of which held that anticipation was justified based on the number of options described in prior art references. Paper 40, page 13.

### C. Discussion

There is precedent supporting Patent Owner's "selection" argument. *In re Arkley*, 455 F.2d 586, 587 (CCPA 1972). A concurring opinion disagreed with what was there referred to as a "picking" and "choosing" analysis; rather it maintained that anticipation should be determined on the basis of the prior art

IPR2014-01558
Patent 5,599,758

disclosure is "sufficient to put the public in possession of the [claimed] invention." 455 F.2d at 590. In one sense the concurrence has a point, because it can be said that it was Patent Owner's inventors who selected from various options described in the prior art.

A recent decision of our appellate reviewing court clarifies the anticipation test as follows:

> A [claim in a] patent is . . . [unpatentable] if "the [claimed] invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.". . . A prior art reference can only anticipate a claim if it discloses all the claimed limitations "arranged or combined in the same way as in the claim.". . . However, a reference can anticipate a claim even if it "d[oes] not expressly spell out" all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference, would "at once envisage" the claimed arrangement or combination. *In re Petering,* 49 CCPA 993, 301 F.2d 676, 681 (1962).

*Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015).

Consistent with *Petering* and *Kennametal*, what we have to factually determine on the record before us is: Has Petitioner established by a preponderance of the evidence that one skilled in the art would "at once envisage" a platinum/barium oxide combination based on the description set out in Saito as quoted above?

In our view, whether a particular embodiment or sub-genus of embodiments is "at once envisaged" can be a function of the number of possible combinations set out in the prior art. If the number is small, then it is possible that a claimed combination may be

IPR2014-01558
Patent 5,599,758

envisaged.  On the other hand, if the possible combination is large, then there is less likelihood that a claimed combination would be envisaged.  What is certain is that there is no *per se* rule on the point.

The burden of proof is on Petitioner to prove that one skilled in the art would have "envisaged" the catalyst/absorber combination claimed by Patent Owner.

Petitioner suggests that the cited portion of Saito describes the claimed combination of catalyst and absorbent.  However, we have found no persuasive reasoning backing up the suggestion.  On the other hand Patent Owner, based on Dr. Crocker's direct Declaration testimony, notes that there are "thousands of different element combinations are possible (even when combining only two elements in the elemental or oxide form)."  Paper 29, page 17; Ex. 2004, ¶ 21.

In the face of Dr. Crocker's testimony, Petitioner has not satisfactorily explained why one skilled in the art would "envisage" Patent Owner's claimed catalyst/absorber combination from the thousands of combinations described by Saito.

Accordingly, we are unable—on this record—to find that Petitioner has established by a preponderance of the evidence that Saito describes the claimed combination.

We therefore find that Saito does not anticipate the subject matter of claim 1 of the '758 patent.

It follows that Saito likewise does not anticipate any challenged claim depending from claim 1.

Patent Owner argues an "intimate and entirely coated" limitation appearing in independent claim 13.  Paper 29, page 19.  We

24

have not found where Petitioner addresses the "intimate and entirely coated" limitation.  Accordingly, Petitioner has not established how Saito meets the "intimate and entirely coated" limitation of claim 13.

Patent Owner also argues the separate patentability of other claims apart from claims 1 and 13.  We do not find it necessary to consider or decide any argument directed to other dependent claims given that independent claims 1 and 13 have not been shown to be anticipated.

## VI.  Analysis—Ground 4 (Obviousness)

### A.  Issues

Ground 4 raises two issues.

A first issue is whether Patent Owner has sustained its burden of production to demonstrate that Campbell is not prior art under § 102(e).

Assuming Campbell is prior art, a second issue is whether Petitioner has established by a preponderance of the evidence that the subject matter of claims 1–14 and 16–20 would have been obvious under 35 U.S.C. § 103(a) over (1) Campbell, (2) Hirota or Saito, and (3) Stiles.

Based on Petitioner's reliance on "Hirota or Saito," we note that the second issue in fact raises two issues:

(1)  patentability based on Campbell, Hirota, and Stiles and

(2)  patentability based on Campbell, Saito, and Stiles.

We have determined that neither Hirota nor Saito anticipates claim 1 of the '758 patent.  However, this does not mean that teachings in Hirota and/or Saito necessarily are irrelevant to

25

IPR2014-01558
Patent 5,599,758

obviousness.  *Arkley*, 455 F.2d at 589 ("It may well be that [the claim on appeal] is unpatentable because obvious under § 103 in view of Flynn, but no such rejection is before us.").

Patent Owner has attempted to incorporate by reference an explanation said to appear in its Opposition in IPR2014-01555.  Paper 29, paragraph bridging pages 29–30.  Incorporation by reference is not permitted.  37 C.F.R. § 42.6(a)(3).  *See also* Final Rule, Rules of Practice for Trials Before the Patent Trial and Appeal Board and Judicial Review of Patent Trial and Appeal Board Decisions, 77 Fed. Reg. 48612, 48617 (Aug. 14, 2012):

> The prohibition against incorporation by reference minimizes the chance that an argument would be overlooked and eliminates abuses that arise from incorporation and combination.  In *DeSilva* v. *DiLeonardi*, 181 F.3d 865, 866–67 (7th Cir. 1999), the court rejected "adoption by reference" as a self-help increase in the length of the brief and noted that incorporation is a pointless imposition on the court's time as it requires the judges to play archeologist with the record.  The same rationale applies to Board proceedings.

We decline to consider any argument or other material incorporated by reference and relating to the Stiles reference.

### B.  Is Campbell Prior Art?

The involved '758 patent names (1) Eugene D. Guth and (2) Larry E. Campbell as inventors.  Ex. 1001A, page 1.

The Campbell patent names (1) Larry E. Campbell, (2) Robert Danziger, (3) Eugene D. Guth, and (4) Sally Padron as inventors.  Ex. 1003A, page 1.

Prima facie Campbell is prior art under § 102(e).

IPR2014-01558
Patent 5,599,758

According to Patent Owner, Campbell is not prior art. Why? Because any relevant discussion in Campbell is said to be a description of an invention made by the inventors named in the involved '758 patent, i.e., Larry E. Campbell and Eugene D. Guth.

Eugene D. Guth is deceased. Ex. 2005, ¶ 3.

According to a direct Declaration testimony of Larry E. Campbell: "Eugene D. Guth and I are the sole inventors of all inventions claimed in the involved '758 patent [Ex. 1001A]." Ex. 2005, ¶ 1.

An inventor's Declaration [i.e., the "oath" required by 35 U.S.C. § 116(a); Ex. 1002A, renumbered page 22] in the application that matured into the '758 patent prima facie establishes that Larry E. Campbell and Eugene D. Guth are the inventors of the subject matter claimed in the involved '758 patent.

According to the Campbell testimony:

> 4. Eugene D. Guth and I solely conceived of and invented the following subject matter disclosed in U.S. Patent No. 5,451,558 [Ex. 1003A]:

> A. The "catalyst absorber, preferably made of alumina/platinum/carbonate salt, is used to oxidize the pollutant oxides and absorb them" as disclosed in the abstract [Ex.1003, page 1].

> B. "A material for removing gaseous pollutants from combustion exhaust comprising an oxidation catalyst specie selected from platinum, palladium, rhodium, cobalt, nickel, iron, copper, molybdenum or combination thereof disposed on a high surface area support, said catalytic component being intimately and entirely coated with an absorber selected from a hydroxide, carbonate,

27

IPR2014-01558
Patent 5,599,758

> bicarbonate or mixture thereof of an alkali or alkaline earth or mixtures thereof" as disclosed and claimed in claim l [Ex. 1003A, col. 12:30–38].
>
> C.     "After the catalyst absorber is spent or partially spent, it can be reactivated.  Reactivation is accomplished by removing and replacing the spent absorber and disposing of the removed spent absorber" as disclosed [in Ex. 1003A] at column 4, lines 44-47.

Ex. 2005.

Patent Owner did not call Robert Danziger or Sally Padron as a witnesses.  Nor did Patent Owner offer any contemporaneous documentary evidence in support of the Campbell testimony.

Petitioner did not cross-examine.  We draw no adverse inference from Petitioner's election not to cross-examine.  If a party believes that an opponent has not made out a case with its testimony, the party is under no obligation to cross-examine.  *Cabilly v. Boss*, 55 USPQ2d 1238, 1249 (BPAI 1998).

According to Patent Owner, the Campbell testimony establishes that all the material in the Campbell patent relied upon by Petitioner is an invention conceived by Campbell and Guth.  Paper 29, page 26.

In support of Ground 4, the Petition cites at least the following portions of Campbell:

> (1)     claim 1 (Paper 3, page 45, page 51—claim chart, page 55—claim chart, page 57—claim chart);
>
> (2)     Abstract (Paper 3, page 49—claim chart);
>
> (3)     col. 2:16–32 (Paper 3, page 47:5–7);

IPR2014-01558
Patent 5,599,758

> (4)    col. 2:59–col. 3:22 (Paper 3, page 46:14–15);
>
> (5)    col. 4:24–31 (Paper 3, page 55—claim chart);
>
> (6)    col. 4:28–31 (Paper 3, page 47:11 and
>         page 55—claim chart, and page 59—claim chart);
>
> (7)    col. 4:36–41 (Paper 3, page 55—claim chart);
>
> (8)    col. 4:44–47 (Paper 3, page  47:5; page 50—claim
>         chart, and page 56—claim chart); and
>
> (9)    col. 5:60–61 (Paper 3, page 46:17).

Principles applicable to the antedating issue before us include those discussed in *In re DeBaun*, 687 F.2d 459 (CCPA 1982).

*DeBaun* involved an antedating effort in the context of *ex parte* patent examination where there is no adverse party.

The *DeBaun* facts are similar to those here in that the reference patent (U.S. Patent 3,842,678) named two inventors (DeBaun and Noll), whereas the reissue application on appeal named one inventor (DeBaun).  Here, the relied upon Campbell patent names four inventors, whereas the involved '758 patent names two inventors— inventors common to the inventors named in the Campbell patent.

In ex parte Rule 132 testimony, DeBaun explained why he was the inventor of the relevant subject matter described in the reference patent.  To corroborate his testimony, DeBaun relied on a drawing. *DeBaun*, 687 F.2d at 461 (citing DeBaun Declaration ¶¶ (a) and (b)). Specifically, in paragraph (a), reference is made to drawing 73-315 [not reproduced in the CCPA's opinion], "which . . . [the CCPA found illustrated] a velocity profile development of an apparatus having open-ended honeycomb velocity equalizing sections." *Id.*  In a

29

IPR2014-01558
Patent 5,599,758

paragraph (c), DeBaun further alleged that "[i]nsofar as the invention . . . [of the DeBaun application pending on appeal before the CCPA] is suggested by drawing No. 73-315, or by anything contained . . . [in the reference DeBaun and Noll patent], it was originally conceived by me and described to patent counsel. . . ." *Id.* at 461–462.

The CCPA stated that the "specific issue raised by this appeal is an evidentiary one." *Id*. at 462. The CCPA also stated that "[t]he only question raised by the rejection is whether appellant invented the relevant disclosure in . . . [the DeBaun and Noll reference] patent." *Id.* at 463.

The CCPA made at least two observations in holding that the evidence was sufficient. *First*, the CCPA concluded that "[o]n the basis of the record here, which includes appellant's unequivocal declaration that he conceived anything in the . . . [DeBaun and Noll] patent disclosure which suggests the invention claimed in his . . . application [on appeal], that question has been satisfactorily answered." *Id. Second*, the CCPA concluded that the Board had erred "in view of appellant's showing that the basic equalizer honeycomb section is appellant's own invention." *Id*. We have observed that there is a tendency in citing *DeBaun* for parties to read too much into the *DeBaun* opinion by relying just on the first observation without taking into account the second observation and the precise facts of the case. As discussed below, *DeBaun* is limited to its facts; a significant fact being the presence of contemporaneous documents. Limiting precedent to its facts is a long-standing principle

30

IPR2014-01558
Patent 5,599,758

of law in the jurisprudence of the United States.  *See*, *e.g.*, *Armour & Co. v. Wantock*, 323 U.S. 126, 132-133 (1944) ("It is timely again to remind counsel that words of our opinions are to be read in the light of the facts of the case under discussion.").

The case before us differs from *DeBaun* in at least two significant ways.  *First*, the Campbell testimony does not contain a paragraph corresponding to DeBaun's paragraph (c) (*DeBaun*, 687 F.2d at 461–462).  Hence, the unequivocal statement to which the *DeBaun* court may have been referring is not present in the case before us.  *Second*, while DeBaun's "story" was corroborated with contemporaneous documentation, i.e., the DeBaun drawing, Campbell's "story" is not supported by any contemporaneous documentation.  According to Petitioner, "the Campbell Declaration (Ex. 2005) is insufficient because there is no accompanying evidence explaining the inventorship assertions in that declaration."  Paper  40, page 17.  We agree.  What we have here is 2015 *uncorroborated* testimony by an *interested* witness about events occurring prior to 1995—a period of at least *twenty years*.

In assessing the weight to give testimony in a case before us, we believe three relevant factors include (1) the time period between events and trial, (2) the interest of the witness, and (3) the absence of contemporary documentary evidence.  *Cf. Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1371 (Fed. Cir. 1998) (citing *In re Reuter*, 670 F.2d 1015, 1021 n.9 (CCPA 1981)); *Sandt Tech., Ltd. v. Resco Metal and Plastics Corp.*, 264 F.3d 1344, 1351 (Fed. Cir. 2001).  The *Sandt* court noted that  "[b]ecause documentary

31

IPR2014-01558
Patent 5,599,758

or physical evidence is created at the time of conception . . ., the risk of litigation-inspired . . . exaggeration is eliminated." 264 F.3d at 1351. The court further noted that "[i]n contrast to contemporaneous documentary evidence, however, post-invention oral testimony is more suspect, as there is more of a risk that the witness may have litigation-inspired motive to corroborate the inventor's testimony." *Id*. At the end of the day, "'all pertinent evidence' is examined in order to determine whether the 'inventor's story' is credible." *Id.* at 1350.

We also will note that the Campbell testimony sets out specific subject matter said to be the invention of Larry E. Campbell and Eugene D. Guth. However, no explanation appears in Patent Owner's opposition, or in the Campbell testimony, addressing all of the subject matter of the Campbell patent upon which Petitioner relies—that material being identified in paragraphs (1) through (9), *supra*. Insofar as we can tell, the Campbell testimony addresses only the subject matter identified in paragraphs (1), (2), and (8).

We decline to credit the Campbell testimony, principally because there is *no contemporaneous documentary evidence* confirming *events taking place a long time ago* reported to us via a witness having an *interest* in the case.

Because we decline to credit the Campbell testimony, Patent Owner has failed to carry its burden of production. We therefore hold that the Campbell patent is prior art under 35 U.S.C. § 102(e).

At oral argument, counsel for Patent Owner called to our attention an ex parte decision of our Board, *Ex parte Griffin*, Appeal

32

IPR2014-01558
Patent 5,599,758

No. 2013-000201 (PTAB Sept. 28, 2015).  Transcript of Oral
Argument, Paper 58, page 36:16–page 38:15.  The *Griffin* panel
opinion, Dr. Griffin's Rule 132 declaration, the first and last page of
Dr. Griffin's curriculum vitae, and the Mosnier reference relied upon
by the Examiner are made of record in this IPR as Ex. 3002.

According to counsel, the *Griffin* panel held that a reference
was not prior art based exclusively on an assertion by an inventor that
the subject matter described in the reference was his own invention.

*Griffin* is not a precedential opinion of our Board.  In any event, and
more importantly, there are significant differences between the ex parte
*Griffin* proceeding and an *inter partes* review proceeding.  In an ex parte
proceeding the PTO may accept an unequivocal statement of an application.
MPEP § 716.10.  An ex parte proceeding is not adversarial.  On the other
hand, an *inter partes* review trial is by definition an *inter partes* adversarial
proceeding in which a petitioner does not have to accept a non-corroborated
allegation of inventorship.

Harkening back to the Supreme Court's admonition in *Armour*, the
*Griffin* panel found that the reference sought to be eliminated stated "[w]e
thank Dr. Andy Gale (Scripps Research Institute) for providing S360A-
APC . . . Stimulating discussions with Dr. Gale and Dr. Berilav Zlokovic are
gratefully acknowledged."  *See* Ex. 3002, *Griffin* at page 5 (finding of fact 8)
and Mosnier (the reference), page  69, near bottom of column 1.  The
acknowledgment of Mosnier was not lost on the *Griffin* panel.  Ex. 3002,
*Griffin* at page 8:4–7.  The acknowledgement statement is consistent with
Dr. Gale having not invented subject matter described by Mosnier.  No
corresponding acknowledgment is present in this case.

IPR2014-01558
Patent 5,599,758

## C.  Prima Facie Obviousness

### 1.  Scope and Content of the Prior Art

#### (a)  Campbell

Campbell states:

> After the catalyst absorber is spent or partially spent, it can be reactivated.  Reactivation is accomplished by removing and replacing the spent absorber and disposing of the removed spent absorber.

Ex. 1003[A], col. 4:44–47.

#### (b)  Hirota

Figures 1A and 3 of Hirota are reproduced below.





Depicted in Figure 1A is a prior art regenerating apparatus.

34

IPR2014-01558
Patent 5,599,758



Hirota Fig. 3

Depicted in Figure 3 is a schematic drawing of a Hirota regenerating

apparatus.

According to Hirota:

a [prior art] regenerating process is carried out by introducing the reducing agent while the exhaust gas flowing into the vessel is cut off.

By cutting off the exhaust gas flowing into the vessel, it is theoretically considered that, in the above method, the amount of the reducing agent required for the regenerating process can be reduced to a sum of the amount required to consume the oxygen content in the exhaust gas remaining in the vessel and the amount required for reducing the $NO_x$ released from the $NO_x$ absorbent.

However, the amount actually required for the regenerating process in the above method becomes much larger than the above theoretical value. This problem is explained with reference to FIGS. 1A and 1B. . . . In FIG. 1A, reference numeral 2 represents an exhaust passage of

35

the diesel engine, and 3 represents a vessel containing a $NO_x$ absorbent 1 connected to the exhaust passage 2. Numeral 5 represents an exhaust shutter valve disposed in the exhaust passage 2 upstream of the vessel 3 to cut off the exhaust gas flowing into the vessel, and 4 represents a nozzle of the reducing agent supply device for supplying a reducing agent to the $NO_x$ absorbent 1 during the regenerating process.

As explained above, the exhaust shutter valve 5 is closed during the regenerating process in this method, and the reducing agent is supplied from the nozzle 4 under the condition in which no exhaust gas flow exists in the vessel 3. Because of the absence of the gas flow carrying the reducing agent, the reducing agent supplied from the nozzle 4 stays in the region near the nozzle 4 and forms a mass of a high concentration reduction agent. This reduction agent progressively diffuses in the vessel, and as time passes, a uniform mixture of the exhaust gas remains in the vessel and the reducing agent is formed. However, in the absence of the gas flow in the vessel, it takes a long time for the reducing agent to diffuse over the entire volume of the vessel. This causes an increase in the time required for the regenerating process to a level not practically acceptable.

Ex. 1006A, col. 2:1–45.

The prior art apparatus described by Hirota, like Campbell, must shut off exhaust in order to regenerate. Ex. 1003A, col. 5:60–61 ("After the catalyst absorber is exhausted or saturated, it can be regenerated.").

To overcome its identified problem, Hirota describes its Figure 3 embodiment:

FIG. 3 schematically illustrates . . . [an] embodiment of the exhaust gas purification device

according to the [Hirota] present invention. In FIG. 3, reference numeral 10 designates an internal combustion engine which is operated on a lean air-fuel ratio, and 2 designates an exhaust passage of the engine 10. In this embodiment, the exhaust passage 2 diverges into two branch exhaust passages 2a and 2b, and exhaust shutter valves 6a and 6b are disposed on the branch exhaust passages 2a and 2b, respectively. Also, vessels 3a and 3b containing $NO_x$ absorbents 1a and 1b are disposed on the branch exhaust passages 2a and 2b downstream of the exhaust shutter valves 6a and 6b. Further, on the branch exhaust passages 2a and 2b between the exhaust shutter valves 6a, 6b and the vessels 3a, 3b, nozzles 4a and 4b of the reducing agent supply device 4 are provided for supplying reducing agent to the $NO_x$ absorbents 1a and 1b.

The $NO_x$ absorbents 1a and 1b contained in the vessels 3a and 3b use, for example, alumina as a carrier, and on this carrier, precious metals such as platinum, and at least one substance selected from alkali metals such as potassium K, sodium Na, lithium Li and cesium Cs; alkali-earth metals such as barium Ba and calcium Ca; and rare-earth metals such as lanthanum La and yttrium Y are carried. The $NO_x$ absorbents 1a and 1b absorb $NO_x$ in the inflowing exhaust gas when the air-fuel ratio of the inflowing exhaust gas is lean, and release the absorbed $NO_x$ when the oxygen concentration of the exhaust gas in the vessels 3a and 3b becomes lower.

Ex. 1006A, col. 5:1–29.

With respect to the operation of the Hirota Figure 3 embodiment, Hirota teaches:

Next, the operation of the exhaust gas purification device in FIG. 3 will be explained.

In this embodiment, the regeneration of the $NO_x$ absorbents 1a and 1b is carried out alternately. Namely,

IPR2014-01558
Patent 5,599,758

> in the normal operation, one of the exhaust shutter valves
> 6a and 6b (for example, 6a) is fully opened and the exhaust
> gas from the engine 10 passes through the $NO_x$ absorbent
> 1a, and the $NO_x$ in the exhaust gas is absorbed in the $NO_x$
> absorbent 1a. After absorbing the $NO_x$ in the exhaust gas
> for a predetermined time, the exhaust shutter valve 6a is
> closed and the exhaust shutter valve 6b is fully opened so
> that the exhaust gas from the engine 10 passes through the
> $NO_x$ absorbent 1b, thus the $NO_x$ in the exhaust gas is
> absorbed in the $NO_x$ absorbent 1b. At the same time, a
> predetermined amount of the reducing agent is injected
> into the branch exhaust passage 2a upstream of the $NO_x$
> absorbent 1a from the nozzle 4a of the reducing agent
> supply device 4 to regenerate the $NO_x$ absorbent 1a.

Ex. 1006A, col. 7:18–36.

(c)  Saito

Figure 1 of Saito is reproduced below.



Saito Fig. 1

Depicted in Figure 1 is an example of the Saito invention

A specific usage example is shown in FIG. 1.

1-a and 1-b are catalysts that oxidize and absorb
$NO_X$, which are arranged in parallel; and 3 is a switching

valve, which guides the exhaust gas from the engine to either catalyst bed 1-a or 1-b.

After [the exhaust gas] has been introduced to one of the catalyst beds for a fixed period of time, [the exhaust gas] is introduced to the other catalyst bed by way of the switching valve. In cases where hydrogen has been selected as the gaseous reducing agent, hydrogen generated by a hydrogen generation device 2 is introduced to the catalyst bed through which exhaust gas is not flowing.

The hydrogen that is output from the hydrogen generation device 2 is sent to a hydrogen reservoir 5, and introduced to the target catalyst bed by way of a switching valve 4.

It is preferable that the hydrogen reservoir 5 be packed with a substance having the capacity to retain hydrogen such as a hydrogen storage metal. When the hydrogen is to be output, the heat of the exhaust gas can be used, or heating by way of electric heating can be used. Furthermore, a check valve 7 is provided to prevent backflow of the hydrogen from the hydrogen reservoir 5 to the electrolysis tank 2.

Ex. 1008A, page 3, col. 1:60–col. 2:20.

(d) Stiles

Stiles describes an adsorbent regenerated *in situ*:

The adsorbed nitrogen oxides, after a period of adsorption, are removed from the adsorbent by regeneration for reuse of the adsorbent. The adsorbent will remove the nitrogen oxides to the extent of 100% at a space velocity exceeding 15,000 and a temperature in the range of 150°–300° C. or above. The nitrogen oxides can be quickly reduced in situ or be evolved from the adsorbent as a concentrated stream by passing a gas containing $N_2$ plus 0.5 to 10% hydrogen

39

IPR2014-01558
Patent 5,599,758

at a temperature of 300° to 350° C. over the saturated
adsorbent. The nitrogen oxides in the concentrated stream
are reduced to nitrogen and water at this temperature.

Ex. 1009A, col. 4:18–30.

Stiles further teaches:

The adsorbent now containing more than 0.2% $NO_x$ by
weight . . . [can be] regenerated for reuse by passing a gas
containing from .05 to 10% hydrogen in nitrogen; both
carbon dioxide and water vapor can also be present.

Ex. 1009A, col. 5:52–55.

Stiles still further teaches that "the adsorbent can be utilized
repeatedly in the adsorption-desorption cycle without loss of
effectiveness." Ex. 1009A, col. 4:34–36.

(b)  Differences

We noted, in instituting an *inter partes* trial, that the Petition and
Dr. Farrauto do not identify in the clearest of terms the differences between
the subject matter of '758 patent claim 1 and Campbell.  Paper 19, page 11.

Dr. Farrauto testified that "Campbell need[s] improvement, because
once the absorbent becomes $NO_x$–saturated, it is discarded." Ex. 1010A,
¶ 35. *See also* Petition, page 47:1–7.

Whenever a ground based on obviousness is involved, the preferred
manner of setting out differences is to state "the subject matter of claim x
differs from the reference in that (1) …, (2) …., and (n) …." Vague
statements or hints of differences not only burdens the Board, but puts a
patent owner at somewhat of a disadvantage with having to guess what any
differences a petitioner believes may exit.  Reluctance on the part of counsel
to "admit" to and identify a difference is hard to understand, given the fact

40

IPR2014-01558
Patent 5,599,758

that a difference does not mean the subject matter claimed is non-obvious. *Dann v. Johnston*, 425 U.S. 219, 230 (1976) (mere existence of differences between the prior art and an invention does not establish the invention's non-obviousness).[4]

Campbell appears to differ from the subject matter of claim 1 of the '758 patent in that Campbell does not describe an *in situ* regeneration.

### 3. Level of Skill in the Art

In our view, the prior art reveals the level of skill in the art.

### 4. Discussion

While Campbell does not describe *in situ* regeneration, and assuming *arguendo* that claim 1 of the '758 patent requires *in situ* regeneration, *in situ* regeneration is a well-known technique described by Saito and Stiles.

An *in situ* regeneration in Campbell makes sense because it eliminates a need to discard spent catalyst and permits one skilled in the art to reuse catalytic material. The reuse of catalytic material would have been recognized as significant due to the expense of platinum. Ex. 1056, page 13:20–23.

Patent Owner maintains that the catalytic material of Saito and Stiles "is very different from that of the '758 patent." Paper 29,

---

[4]  Petitioner's failure to clearly identify differences is not consistent with 37 C.F.R. § 42.104(b)(4) and 42.104(b)(5), as well as 35 U.S.C. § 312(a)(3), which require identifying the grounds "with particularity." The Petition must specify where each element of a challenged claim is found in the prior art patents or printed publications. 37 C.F.R. § 42.104(b)(2).

page 29.  "There is nothing in either Saito or Stiles to suggest . . . that
the regeneration methods of these two references might be succesfully
used for regenerating the catalyst/absorber of Campbell."  *Id.* at
page 30.

Patent Owner's argument amounts to individual attacks on each of the
prior art references.  *In re Keller*, 642 F.2d 413 (CCPA 1981).  By attacking
each reference individually, Patent Owner runs head-on into an admonition
in *KSR* that a person having ordinary skill in the art is not an automaton.
*KSR*, 550 U.S. at 421.  Unexplained by Patent Owner, is why one skilled in
the art, in the face of Saito and Stiles, would not have found it obvious to use
an *in situ* regeneration process in a Campbell environment to avoid
discarding spent catalyst.

Assuming *arguendo* that the catalysts of Saito and Stiles are different
from those described by Campbell, one skilled in the art would have
appreciated that the regeneration technique described by those references,
i.e., the device illustrated in Figure 1 of Saito, would have been equally
applicable for regenerating in the Campbell environment.

We therefore agree with Petitioner that:

> [Campbell, Saito and Stiles] establish that . . .
> challenged . . . [claim 1] cover[s] a process in which all
> ingredients are known and being used for their intended
> purpose in a known manner to achieve an entirely
> expected result -- regeneration of a spent catalyst absorber.
> *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007).

Paper 40, page 21.

Patent Owner addresses other arguments related to claim 1, as
well as the separate patentability of several claims apart from claim 1.

IPR2014-01558
Patent 5,599,758

Claim 1

Patent Owner maintains that the combination of Campbell and Hirota do not support a finding that the combination describes an inert carrier gas.  Paper 29, page 32.  We agree, principally because as we held earlier in this opinion, Hirota has not been shown to describe an inert carrier gas.  Hirota need not be relied upon when analyzing obviousness vis-à-vis the prior art combination of Campbell, Saito, and Stiles.

According to Patent Owner, the combination of Campbell and Saito fails to provide a necessary reason for using the *in situ* regeneration of Saito in a Campbell environment.  Paper 29, page 32.  We disagree.  For the reasons given above, one skilled in the art would have recognized the value of *in situ* regeneration in a Campbell environment apart from the catalyst/absorber described by Saito.

Claim 2

Patent Owner notes that claim 2 also requires a carrier gas and that Hirota does not describe a carrier gas.  We need not analyze Hirota to resolve obviousness based on the prior art combination of Campbell, Saito, and Stiles.

Patent Owner also notes that claim 2 calls for a temperature in the range of 250 ℃ – 750 ℃.  Patent Owner calls our attention to the fact that Saito describes "a temperature range that overlaps with, but far exceeds the range of claim 2."  Paper 29, page 32.  In support of its argument, Patent Owner does not state the temperature ranges.  We note that Saito describes a temperature range of from 150 ℃ – 800 ℃, and in particular, 200 ℃ – 700 ℃.  Ex. 1008B, page 4:15–16 and 38–39.  We view Patent Owner's "far

43

exceeds" to be somewhat of an overstatement.  In any event, Patent Owner
has failed to establish that the difference in ranges is significant.
Overlapping ranges generally support a prima facie case of obviousness.  *In
re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003) (a prima facie case of
obviousness typically exists when the ranges of a claimed composition
overlap the ranges disclosed in the prior art).

## Claim 3

Claim 3 calls for a regenerating gas comprising up to 10% carbon
dioxide.  According to Patent Owner, Saito describes the presence of carbon
dioxide in the exhaust gas, but not the regeneration gas.  Paper 29, page 33;
Saito, Ex. 1008B, page 4:17.  Overlooked, and not addressed by Patent
Owner, is a description of the use of carbon dioxide in a reducing gas
described by Stiles.  Ex. 1009A, col. 5:52–55 ("[t]he absorbent . . . is
regenerated for reuse by passing a gas containing . . . hydrogen in nitrogen;
both carbon dioxide and water vapor can also be present").

## Claim 13

Patent Owner argues that Saito is defective because Saito is not
concerned with restoring a carbonate form of the absorber.  Paper 29,
page 33.  Patent Owner's argument overlooks the fact that it is the Campbell
catalyst that is to be regenerated using the *in situ* regeneration technique
taught by Saito.  The fact that Saito's catalyst is different is not controlling.
It is the combination of using Saito's known *in situ* regeneration technique
in the Campbell environment that renders regeneration of the carbonate form
obvious to one skilled in the art.

According to Patent Owner, "Saito . . . fails to teach the addition of
CO [carbon monoxide] or CO2 [carbon dioxide] if hydrogen, the preferred

IPR2014-01558
Patent 5,599,758

reducing agent . . . is used as the reducing agent." Paper 29, pages 33–34.

Saito teaches the use of "ordinary reducing agents such as hydrogen, ammonia, carbon monoxide, hydrocarbons, such as methane, and the like . . . [with] hydrogen is the most preferred." Ex. 1008B, page 4: col. 1:27–31.

Claim 13 calls for the use, *inter alia*, of a reducing agent selected from carbon monoxide and hydrogen gas. A reference is not limited to its preferred embodiment. Saito manifestly teaches the use of carbon monoxide. *See also* Stiles, Ex. 1009A, col. 5:52-55 (teaching the use of hydrogen where carbon dioxide can also be present).

### Claims 16 and 20

Claims 16 and 20 require steam to be present in the carrier gas. Paper 29, pages 34–35. While agreeing that Saito describes the use of steam in the exhaust gas, Patent Owner maintains that Saito does not describe the presence of steam in the regeneration gas. *Id*. Overlooked by Patent Owner is a teaching in Stiles that the regeneration gas can contain "water vapor." Ex. 1009A, col. 5:55. What is clear from the record is that the regeneration gas can contain hydrogen, nitrogen, carbon dioxide, and water vapor per Stiles and hydrogen, ammonia, carbon monoxide, and hydrocarbons per Saito. Selection of a particular gas has not been shown to be beyond the skill in this art. In fact, we note that selection of a particular gas appears to be a function of the reduction process undertaken. Ex. 1009A, col. 1:58–63 (discussing use of ammonia in an SCR process).

### Claim 17

Claim 17 calls for an inert reducing gas comprising about 500 ppm to 10% hydrogen. Stiles describes the use of a reducing gas having 0.05 to 10% hydrogen. Ex. 1009A, col. 5:54. Patent Owner thus is using a known

IPR2014-01558
Patent 5,599,758

amount of hydrogen in a reducing gas to achieve an expected and intended result.

### D. Other Considerations

According to Patent Owner, evidence of a long-felt need and commercial success trumps any prima facie case of obviousness. Paper 28, pages 35–42.

A long-felt need and post-invention commercial success can tip the balance in favor of non-obviousness, both in the courts and the PTO. *Eibel Process Co. v. Minnesota & Ontario Paper Co.*, 261 U.S. 45 (1923); *Carnegie Steel Co. v. Cambria Iron Co.*, 185 U.S. 403 (1902); *The Barbed Wire Patent*, 143 U.S. 275 (1892); *Webster Loom v. Higgins*, 105 U.S. 580 (1881); *Ex parte Artsana USA, Inc.*, Appeal 2014-004116, 2014 WL 4090808 (PTAB Aug. 18, 2014); *Murata Mfg. Co. v. Synqor, Inc.*, Appeal 2014-001167, 2014 WL 1397381 (PTAB Apr. 10, 2014); *Ex parte Whirlpool Corp.*, Appeal 2013-008232, 2013 WL 5866602 (PTAB Oct. 30, 2013). However, in this case, we are unable to credit much, if any, weight, to Patent Owner's evidence of long-felt need and commercial success. For long-felt need and commercial success to be convincing, there must be a "nexus" between (1) the long-felt need/commercial success and (2) the claimed subject matter. *In re Fielder*, 471 F.2d 640, 646 (CCPA 1973).

Patent Owner's evidence is bottomed on Patent Owner's experience with what is referred to as a "SCONOx catalytic absorption system." Ex. 2006A ¶ 4 (direct Declaration testimony of Thomas Girdlestone).

Patent Owner characterizes the claimed method as embodying a SCONOx system. Paper 29, page 37:3–4.

IPR2014-01558
Patent 5,599,758

According to Mr. Girdlestone, the effectiveness of reducing NOx in a SCONOx system was tested at a turbine facility run at EmeraChem's then-affiliate Sunlaw Energy in California.  Ex. 2006A, ¶ 5.

Further according to Mr. Girdlestone, both the EPA and the Cal EPA found impressive a reduction of NOx pollutants from 5–9 ppm to 1–2 ppm. Ex. 2006A, ¶¶ 5–10.

Without getting into specific confidential commercial numbers, Mr. Girdlestone testified that Patent Owner received considerable revenue from licensing agreements to various entities.  However, missing from Patent Owner's story is any market share information.  We therefore cannot meaningfully assess the weight to be given to Patent Owner's revenues.

Petitioner argues that Patent Owner has not established a necessary nexus between Patent Owner's commercial activities and the claimed invention.  Paper 40, pages 21–22 ("Patent Owner has not shown . . . how its SCONOx regeneration process embodies each and every limitation of claim 1" of the '758 patent).

We have not been directed to testimony comparing the SCONOx process performed at Sunlaw Energy in California vis-à-vis the subject matter of the claims of the '758 patent.

On cross-examination, Mr. Girdlestone testified:

> Q. [by counsel for Petitioner] Did you review these patents during your preparation of the Declaration [Ex. 2006A]?
>
> A. No, I did not.
>
> Q. Do you consider yourself qualified to determine whether the use of a catalyst absorber satisfies all the limitations of a claim in the . . . 911 patent?

47

IPR2014-01558
Patent 5,599,758

> A. Probably no.
>
> Q. Why do you say that?
>
> A. Well, when it comes to the -- these are based on a lot of science and chemistry. I understand the inputs and the outputs, but everything in between the inputs and outputs as to the fundamental drivers of the chemistry, I'm not an expert in that. And as for the administration prosecution -- legal prosecution, I'm not an attorney. I'm not an expert on that. My job is to make sure this work was done, it was done on time, it was done on budget. And to assess value to it as compared to the application that we want to apply this technology to on the commercial set. I'm mostly on the commercial side of business.

Ex. 1057, page 17:4–25.

Insofar as we are aware, Dr. Crocker did not testify on whether any SCONOx testing was consistent with the claims of the '758 patent.

We have not been told which claim, if any, is limited to the alleged commercially successful embodiment tested at Sunlaw Energy in California. *In re Tiffin*, 448 F.2d 791 (CCPA 1971) (on rehearing, CCPA held that evidence of commercial success must be commensurate in scope with the breadth of the claims); *In re Law*, 303 F.2d 951, 954 (CCPA 1962) (same).

We also find Patent Owner's long-felt need analysis unconvincing. *First*, we have not been told when a need first arose to reduce NOx emissions. *Second*, assuming it arose sometime not too long before 1997, it does not appear that it took long to solve the problem. *Third*, no evidence has been directed to our attention confirming that those trying to solve the problem were aware of either Saito or Stiles. *In re Allen*, 324 F.2d 993, 997

IPR2014-01558
Patent 5,599,758

(CCPA 1963) (while appellant's arguments imply that there may have been an unsolved problem in the art, an allegation to this effect is not evidence of unobviousness unless it is shown, as was not done here, that [1] the widespread efforts of [2] skilled workers [3] having knowledge of the prior art [4] had failed to find a solution to the problem (citing *Toledo Pressed Steel Co. v. Standard Parts, Inc.*, 307 U.S. 350, 356 (1939) (it does not appear that those trying to solve the problem were familiar with the relevant prior art))).

E.  Prima facie Obviousness vis-à-vis Secondary Consideration

For reasons given above, in this case we decline to accord much, if any, weight to Patent Owner's evidence of long-felt need and commercial success.

When the secondary consideration evidence is weighed vis-à-vis the prima facie case of obviousness, we believe the balance favors the prima facie case.

Accordingly, we hold that Petitioner's evidence establishes by a preponderance that the subject matter of claims 1–14 and 16–20 of the '758 patent would have been obvious within the meaning of § 103.

VII.  Motions to Exclude

A.  Patent Owner's Motion to Exclude

Patent Owner "moves to exclude portions of Petitioner's Reply (Paper Nos. 39, 40) as presenting new issues for the time in a Reply." Paper 45, page 1.

Petitioner has opposed.  Paper 52.

A motion to exclude should be limited to seeking to exclude "evidence," not arguments in a reply.

49

IPR2014-01558
Patent 5,599,758

We therefore treat Patent Owner's motion to exclude as a motion to expunge part or all of Petitioner's Reply.

According to Patent Owner, Petitioner has raised new arguments in its Reply related to the issue of whether Saito anticipates challenged claims of the '758 patent.

We have determined that Petitioner has failed to establish that Saito anticipates any challenged claim, even if the entire Reply is considered.

Because Patent Owner has prevailed on the issue of whether Saito anticipates any challenged claims, the issue raised in Patent Owner's Motion to Exclude need not be decided.

Patent Owner's Motion to Exclude is dismissed as *moot*.

### B.  Petitioner's Motion to Exclude

Petitioner moves to exclude Exhibit 3 forming part of the direct declaration testimony of Thomas Girdlestone (Ex. 2006).  Paper 47.

Patent Owner has opposed.  Paper 52.

Petitioner has replied.  Paper 54.

### 1.

In view of our analysis for not crediting Patent Owner's commercial success evidence, we have not found it necessary in this opinion to identify specific sales figures.

As to Exhibit 3, the Motion to Exclude is *dismissed* as moot.

### 2.

Petitioner objects to certain Girdlestone testimony as hearsay (Paper 47, page 4) and for lack of authentication (Paper 47, page 7).

IPR2014-01558
Patent 5,599,758

In view of the basis upon which we have declined to credit Patent Owner's evidence of commercial success, we have not found it necessary to consider the objected to testimony.

As to the objected to testimony, the Motion to Exclude is *dismissed* as moot.

## C.

We will also note that, to a large extent, the Motion to Exclude amounts to supplementing argument on the merits, thereby impermissibly extending page limits for other documents.

## VIII.  Sealed Documents

In reaching our decisions, we have not found it necessary to rely on any redacted portion of the public documents.

The parties should promptly move to expunge all documents filed under seal.

## IX.  Large Documents

The parties have filed several large documents, i.e., documents containing many pages.

An example is the prosecution history of the involved '758 patent (Ex. 1002).

At oral argument, the following discussion took place emphasizing why merely placing a large document in the record without citing to specific pages of the documents, only to later rely for the first time on a non-cited portion of the document at oral argument or on appeal, is not appropriate.

> [Mr. Bradford, counsel for Patent Owner] Now, the '758 patent, if you turn to exhibit -- or slide 5 of our demonstrative, the file history for '758 shows that when it was filed there was a

51

regeneration method, and, it says 10 months later, this is very soon thereafter, the slide 5 shows claim 1, and then very specifically the same dependent claim, almost exact dependent -- or very similar dependent claims were included. Claim 9 says explicitly there is an alkali or alkaline earth carbonate.

JUDGE McKELVEY: Now, were these arguments made in the opposition?

MR. BRADFORD: Well, they are in the record.

JUDGE McKELVEY: So I'm trying to figure out how -- you put your proofs in and then they are supposed to respond to it -- I'm trying to figure out how they respond to what you are just addressing right now?

MR. BRADFORD: Well, this is evidence that they have had in the record.

JUDGE McKELVEY: Well, but it is not their job to go looking through the record to make your case out, nor is it ours. So if you come to oral argument and you lay out these options, how are they supposed to have answered that?

MR. BRADFORD: Well, Your Honor, I mean, this is clear on the face that these are just the inventors of the two patents. They said they invented this. And this corroborates -- the claims in the '758 patent corroborate that they invented it. They include the specific catalyst as dependent claims in the claims. I mean, it is evident whenever they are saying we invented this that it is included in both patents. I mean, we didn't make this explicit citation to the record, but they did. It is clear, just by looking at the claims, they said they invented them.

JUDGE McKELVEY: See, this is one of the problems of putting in a file wrapper and not identifying specific pages, because you will find at the end of our decision when it comes out that pages not cited to us in the documents are excluded from evidence,

IPR2014-01558
Patent 5,599,758

> because what happens is somebody goes on appeal and starts
> making a new argument based on evidence that neither the
> Petitioner had an opportunity to look at and comment on the
> reply or we did.  And the court doesn't particularly like that sort
> of thing.

*See* Transcript of Oral Argument, Paper 58, page 32:15 through page 34:6.

We decline to consider an argument made for the first time at oral argument based on portions of a large document not cited in the Petition, Opposition, or Reply.

With respect to these large documents, we have considered only the pages called to our attention by the parties or mentioned in our opinion.

All other pages were not considered and are deemed not to have been admitted into evidence.

### X. Order

Upon consideration of the Petition (Paper 3), Opposition (Paper 29), and Reply (Paper 40), and for the reasons given, it is

ORDERED that based on Ground 1 (Hirota), the evidence does not establish by a preponderance of the evidence that any challenged claim is unpatentable;

FURTHER ORDERED that based on Ground 2 (Takeshima), the evidence does not establish by a preponderance of the evidence that any challenged claim is unpatentable;

FURTHER ORDERED that based on Ground 3 (Saito), the evidence does not establish by a preponderance of the evidence that any challenged claim is unpatentable;

IPR2014-01558
Patent 5,599,758

FURTHER ORDERED that based on Ground 4 (obviousness), the evidence establishes by a preponderance of the evidence that claims 1–14 and 16–20 of the '758 patent are unpatentable under 35 U.S.C. § 103(a).

FURTHER ORDERED that because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

For PETITIONER:

Steven F. Meyer
ptopatentcommunication@lockelord.com

Seth J. Atlas
satlas@lockelord.com

John F. Sweeney
jsweeney@lockelord.com

For PATENT OWNER:

Michael J. Bradford
mbradford@luedeka.com

Jacobus C. Rasser
koosrasser@gmail.com

54

US005599758A

# United States Patent [19]

## Guth et al.

| | |
|---|---|
| [11] | **Patent Number:** **5,599,758** |
| [45] | **Date of Patent:** **Feb. 4, 1997** |

[54] **REGENERATION OF CATALYST/ABSORBER**

[75] Inventors: **Eugene D. Guth**, Torrance, Calif.; **Larry E. Campbell**, Knoxville, Tenn.

[73] Assignee: **Goal Line Environmental Technologies**, Los Angeles, Calif.

[21] Appl. No.: **371,274**

[22] Filed: **Dec. 23, 1994**

[51] Int. Cl.$^6$ ............................ **B01J 20/34**; B01J 38/10; B01J 38/36

[52] U.S. Cl. ................................ **502/34**; 502/42; 502/53; 502/56

[58] Field of Search ................................. 502/34, 42, 51, 502/53, 56

[56] **References Cited**

U.S. PATENT DOCUMENTS

3,230,179   1/1963   Schwarzaenbek .......................... 502/53

| | | | |
|---|---|---|---|
| 3,856,485 | 12/1974 | Mansell | 55/73 |
| 3,953,575 | 4/1976 | Gidaspow et al. | 423/212 |
| 4,323,544 | 4/1982 | Maader | 423/239 |
| 4,533,365 | 8/1985 | Ringel | 55/28 |
| 4,789,531 | 12/1988 | Eichholtz et al. | 423/235 |

*Primary Examiner*—Anthony McFarland
*Assistant Examiner*—Alexander G. Ghyka
*Attorney, Agent, or Firm*—Kenneth H. Johnson

[57] **ABSTRACT**

Hydrogen or carbon monoxide in a carrier of nitrogen or steam is passed over a devitalized catalyst/carbonate or bicarbonate absorber which has absorbed or adsorbed nitrates and nitrites from engine exhaust to restore the carbonate form and regenerate the devitalized catalyst/absorber for reuse.

**20 Claims, No Drawings**

5,599,758

| 1 | 2 |

# REGENERATION OF CATALYST/ABSORBER

## BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention is directed to a process for the regeneration of the devitalized catalyst/absorber after extended exposure to pollutants in the combustion gases of engines.

2. Related Information

Turbine power plants are becoming the standard for generating electricity because they are so efficient compared to any other form of power manufacture. Turbine power plants that burn methane to produce power for residents and manufacturing facilities in cities also produce carbon monoxide and nitrogen oxide as pollutants. It is highly desirable to reduce or eliminate these pollutants so that the air is not contaminated as a result of power production.

Over the years, as the technology improved, the level of permitted pollution has been decreased. Initially, the permitted level of pollution by power plants for nitrogen oxides (NOx), which includes nitric oxide (NO) and nitrogen dioxide ($NO_2$), was less than 100 parts-per-million (ppm) and the level of carbon monoxide (CO) was less than 100 ppm. Later, the requirements were made more stringent and it was necessary to reduce the NOx to less than 25 ppm and the CO today is still permitted at any amount less than 100 ppm. Using current technology, the output levels of NOx can be reduced to the range of 5 to 9 ppm plus slippage resulting from the selective catalytic reduction (SCR) technology described below.

The only prior technology which is currently available to obtain the 5 to 9 ppm NOx levels is called selective catalytic reduction in which ammonia is mixed with the flue gas and then passed over a catalyst which selectively combines the nitrogen oxides and ammonia to eliminate a major portion of the NOx. One problem with the selective catalytic reduction is than, as a practical matter, it is only capable of reducing the NOx to the range of 5 to 9 ppm. Another problem, referred to as slippage, is that the ammonia injected into the system to react with the NOx slips past the catalyst without conversion and is ejected from the system in its native form, which is hazardous to the environment in its own right.

There have been other technologies for reduction of pollution which have been advanced, such as overwatering in the combustor, and these also have the potential to reduce the NOx pollution, but none of them reduce the NOx to levels much less than 5 to 9 ppm.

In our co-pending application Ser. No. 08/066,361 filed on May 24, 1993, which is incorporated herein in its entirety, we described a pollution reduction process and apparatus in which the pollutants from a turbine gas stream including NO and CO in the gas stream are first oxidized to corresponding $NO_2$ and $CO_2$, and then the $NO_2$ is absorbed on an absorption bed.

In our co-pending U.S. Pat. No. 5,451,558 which is incorporated herein in its entirety, a catalyst/absorber is described comprising an oxidation catalyst specie selected from platinum, palladium, rhodium, cobalt, nickel, iron, copper, molybdenum or combinations thereof disposed on a high surface area support, said catalytic component being intimately and entirely coated with an absorber material selected from a hydroxide, carbonate, bicarbonate or mixture thereof of an alkali or alkaline earth or mixtures thereof. For example a support with an alumina washcoat disposed thereover, a platinum catalyst disposed on the washcoat, and

with an alkali or alkaline earth carbonate or bicarbonate coating thereon, the carbonate coating being lithium, sodium, potassium or calcium carbonate. This application also discloses a process for treating exhaust streams in which the stream is contacted with the catalyst/absorber which oxidizes the nitrogen oxides to nitrogen dioxide; oxidizes the carbon monoxides to carbon dioxide; and oxidizes the sulfur dioxide ($SO_2$) to sulfur trioxide ($SO_3$). This oxidation occurs at temperatures in the range of 150° to about 750° F., and more preferably in the range of 175° to 400° F., and most preferably in the range of 200° to 365° F. The space velocity (GHSV) of the exhaust gas may be in the range of 5,000 to 50,000 $hr^{-1}$. The same catalyst/absorber has a second function of absorbing the oxidized pollutants at the same temperatures so that the resultant exhaust gas stream is substantially free of harmful pollutants.

When the catalyst/absorber ceases to be effective, and specifically, when the level of pollutants emanating from the apparatus after contact with the catalyst/absorber increases beyond an acceptable level, the absorber can be replaced, and the used absorber should then be recharged to an effective status again. One method of regenerating the catalyst is to remove the spent (saturated or partially saturated) carbonate from the catalyst/absorber and replace the spent carbonate with fresh unreacted carbonate, for example, dissolving the absorber, generally potassium carbonate or sodium carbonate, from the absorber/catalyst to remove the absorber from the catalyst, and then replacing the absorber on the catalyst with fresh absorber. The nitrates and nitrites are then separated from the unreacted carbonate in the dissolved absorber so the unreacted carbonate can be reused. However this process would most likely require removal of the catalyst/absorber from the exhaust system and create large quantities of liquid waste streams to dispose of.

It would be desirable to provide a system for regenerating the absorber, rather than removing it, which is easier, simpler, faster, less labor intensive and less expensive than those systems known in the prior art.

It is an advantage of the present invention that the regeneration of the catalyst/absorber may be carried out in situ. It is a further advantage of the present invention that it is carried out without liquid reagents. It is a feature of the present invention that the by-products of the regeneration are easily disposed of. It is a particular feature of the invention that the gases used in the regeneration are low cost and readily available.

## SUMMARY OF THE INVENTION

In the present invention, a devitalized catalyst/absorber is regenerated, that is, treated to restore the initial activity or to otherwise substantially improve the activity, by passing a regeneration gas over it. Briefly the present invention is a method for regenerating devitalized absorber used for removing nitrogen oxides from gases and containing an alkali or alkaline earth metal carbonate or bicarbonate component of the absorber comprising: contacting the devitalized absorber with a gaseous stream containing an effectuating amount of reducing agent to remove a portion of the nitrogen oxides. In a preferred embodiment the devitalized absorbent is a component of a catalyst/absorbent composition. Suitable reducing agents include carbon monoxide, hydrogen and mixtures thereof. The principal component of the gaseous stream is an inert carrier gas such as nitrogen, helium, argon or steam.

## DETAILED DESCRIPTION OF THE INVENTION

The regeneration gas comprises a reactant gas or mixture of reactant gases along with a carrier gas or carrier gas

5,599,758

3

mixture. The reactant gases are reactive reducing agents to convert the oxidized forms of the absorber made in the absorption step. The preferred reactants gases are carbon monoxide or hydrogen or combinations of carbon monoxide and/or hydrogen. The reactant gases make up about 500 ppm to 10 percent of the regeneration gas; the remainder of the regeneration gas is the carrier gas mixture.

The carrier gas may comprise principally nitrogen or steam, for example, preferred 50 percent or more nitrogen and may have smaller concentrations of carbon dioxide and steam or 50 percent or more steam and may have smaller concentrations of nitrogen and carbon dioxide. Nitrogen in high concentrations of about 50% to about 80% provides an excellent carrier for the reductants. Steam is also a good carrier in concentrations of 30% to 98% with the balance being nitrogen.

The regeneration gas is substantially oxygen free, although up to one percent oxygen may be present without significant negative effects.

The devitalized catalyst/absorber has absorbed or adsorbed nitrogen oxides and sulfur oxides in a plurality of chemical forms. The reactant gas reduces the nitrogen oxides to eliminate nitrogen and displaces the sulfur oxide. The apparent stoichiometry is two moles of carbon monoxide and/or hydrogen for each mole of nitrogen oxide on the catalyst/absorber and one mole of reactant gas for each mole of sulfur oxide on the catalyst/absorber.

The regeneration of the catalyst/absorber by this method can be performed at temperatures preferably in the range of 250° to 750° F. and preferably at a pressure of substantially one atmosphere pressure. Usually the temperature is the same temperature at which absorption was carried out, for economic reasons, but there is no actual limitation on the temperature provided that it is within the range set forth above. The gaseous stream may be conducted through the regeneration chamber at a fairly wide range of flow rates. The optimum flow rate will depend upon such variables as the temperature of the reaction, pressure and particle size or channel size in the case of certain supports. The flow rate is measured by the gaseous volumes of the regeneration stream (including the carrier and reactive gases) per volume of chamber containing catalyst/absorber per hour, referred to as the gas hourly space velocity (GHSV). The GHSV for the present regenerations may be in the range of 10 hr⁻¹ to 100,000 hr⁻¹, preferably at least 100 hr⁻¹ and less than 30,000 hr⁻¹, more preferably in the range of 500 hr⁻¹ to 16,000 hr⁻¹. The regeneration time is determined by the stoichmetries, i.e., moles absorbed and the concentration of the reactant gas and the flow rate of the regeneration gas. The regeneration reactions are rapid and completion of regeneration can be determined by monitoring the off gas for reactant gases. Usually the regenerations within the preferred temperature range will require at least about 2 minutes to about 10 minutes. At temperatures substantially the preferred range regenerations can require up to an hour.

Efficiencies of up to 99.9% for nitrogen oxide reactions to nitrogen and water can occur during the regeneration.

Carbon dioxide, up to at least about 10%, may be added to regeneration gases containing hydrogen to regenerate the carbonate form.

The regeneration system of the present invention works with both non-aqueous and aqueous platinum deposited catalysts.

### EXAMPLES

The following test results show that the catalyst/absorber can be regenerated with satisfactory performance. In the

4

examples which utilized a catalyst/absorber of PtMO, these are made by a non-aqueous process described in Ser. No. 08/307,939 filed Sep. 16, 1994 which is incorporated herein in its entirety. The reference to 0.23% refers to the loading of the catalyst/absorber with 0.23% by weight platinum. The absorber on each of the catalysts is potassium carbonate. In the various examples, the regeneration gas composition, including the reactant and the carrier are varied, and the temperature of regeneration and space velocity are also varied.

In the examples using an aqueous platinum absorber/catalyst, the catalyst is a platinum catalyst prepared from a solution of a mono ethanol amine platinum compound. Hexachloro platinic acid is the starting material. The chloride is quantitatively reacted and completely separated from the platinum. The platinum is dissolved in water as a mono ethanol amine platinum compound and is then applied to a support from this solution. The platinized support is heated to remove the water and mono ethanol amine.

In the following examples several variations in regeneration gases and conditions are demonstrated for both aqueous platinum and organometallic platinum catalysts. Examples 1 through 7 are for aqueous catalysts, and 8 through 12 are for organometallic catalysts.

Aqueous Catalyst Preparation

The catalyst for Examples 1 to 7 is aqueous platinum, prepared as follows:

Alumina wash coat 1.6 gms/cu in.

Platinum loading 46 gms/cu ft. calc at 500° C.

Absorber 7.8% K₂CO₃ impregnated at 60° C.

Absorption inlet gas composition for Examples 1 and 2

| N₂ | 73% | NO | 30 ppm |
|---|---|---|---|
| CO₂ | 3% | CO | 10 ppm |
| Water | 10.2% | | |
| O₂ | 13.7% | | |

### Example 1

| Absorption temp 300° F.; GHSV 20,000 hr⁻¹ | | | | | | | |
|---|---|---|---|---|---|---|---|
| Off Gas | Time, min. | 2 | 6 | 10 | 15 | 20 | 25 | 30 |
| | NOx ppm | 0.65 | 0.78 | 1.0 | 1.3 | 1.8 | 2.1 | 2.8 |
| | CO ppm | 0.9 | 1.4 | 1.8 | 2.2 | 2.7 | 3.1 | 3.4 |

| Regeneration conditions temp 250° F, GHSV 1000 hr⁻¹ | | | | |
|---|---|---|---|---|
| Inlet Gas | Steam | 89.7% | Hydrogen | 1.75 |
| | Nitrogen | 7.30 | Carbon Dioxide | 1.25 |
| Off Gas | Time, min. | 0.5 | 1 | 3 | 5 |
| | NOx ppm | .11 | .10 | .11 | .075 |
| | CO ppm | 0 | 0 | 3.2 | 3.8 |

| Absorption temp 300° F., GHSV 20,000 hr⁻¹ | | | | | | | |
|---|---|---|---|---|---|---|---|
| Off Gas | Time, min. | 2 | 6 | 10 | 15 | 20 | 25 | 30 |
| | NOx ppm | .7 | .8 | 1.1 | 1.35 | 1.7 | 2.35 | 2.6 |
| | CO ppm | .8 | 1.3 | 1.8 | 2.0 | 2.5 | 2.8 | 3.0 |

Comments:

This test demonstrates absorption—regeneration—absorption at 250°–300° F., using a hydrogen reactant gas and steam carrier gas. The efficiency for NOx destruction was 99.96%; that is, only 0.04% of the NOx absorbed was off gassed during regeneration. The NOx destroyed was converted to elemental nitrogen.

5,599,758

<table>
<tr><td><strong>5</strong></td><td><strong>6</strong></td></tr>
</table>

## 5

### Example 2

| | Absorption temp 690° F.; GHSV 20,000 hr⁻¹ | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Off Gas | Time, min. | 2 | 6 | 10 | 15 | 20 | 25 | 30 |
| | NOx ppm | 0.4 | 0.3 | .3 | .4 | .5 | — | .9 |
| | CO ppm | 0 | 0 | 0 | 0 | 0 | | |

| Regeneration conditions temp 714° F.; GHSV 1000 hr⁻¹ | | | | | |
|---|---|---|---|---|---|
| Inlet Gas | Steam | 89.7% | Hydrogen | 1.73 | |
| | Nitrogen | 7.3 | Carbon Dioxide | 1.25 | |
| Off Gas | Time, min. | 1 | 2 | 4 | 5 |
| | NOx ppm | 0.1 | 0.1 | 0.05 | 0.05 |
| | CO ppm | 0 | 0 | 7.4 | 8.5 |

| | Absorption temp 700° F.; GHSV 20,000 hr⁻¹ | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Off Gas | Time, min. | 2 | 6 | 10 | 15 | 20 | 25 | 30 |
| | NOx ppm | 0.4 | 0.3 | 0.3 | 0.3 | 0.4 | 0.6 | 1.5 |
| | CO ppm | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Comments: This test demonstrates absorption-regeneration - absorption at 690° F.–714° F. Hydrogen was the reactant gas. The efficiency for NOx destruction was 99.95%.

Absorption inlet gas composition for Examples 3 to 7

| N₂ | 73% | SO₂ | 98 ppb |
|---|---|---|---|
| CO₂ | 3% | NO | 30 ppm |
| Water | 10.2% | CO | 10 ppm |
| Oxygen | 13.8 | | |

### Example 3

| | Absorption temp 300° F.; GHSV 20,000 hr⁻¹ | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Off Gas | Time, min. | 2 | 6 | 10 | 15 | 20 | 25 | 30 |
| | NOx ppm | .3 | .5 | .7 | .9 | 1.2 | 1.8 | 2.6 |
| | CO ppm | 0 | 0 | 0 | .2 | .2 | .3 | .4 |
| | SO₂ ppb | 0 | 0 | 0 | 0 | .5 | 2.0 | 3.8 |

| Regeneration conditions temp 350° F.; GHSV 1000 hr⁻¹ | | | | | | |
|---|---|---|---|---|---|---|
| Inlet Gas | Steam | 97% | Carbon Dioxide | 1.25% | | |
| | Hydrogen | 1.73% | | | | |
| Off Gas | Time, min. | 0.5 | 1 | 1.5 | 2 | 3 |
| | NOx ppm | 0.2 | 0.2 | 0.2 | 0.1 | 0.1 |
| | CO ppm | 0 | 0 | 0 | 0 | 0 |
| | SO₂ ppb | 16 | 10 | 10 | 10 | 9 |

| | Absorption temp 300° F.; GHSV 20,000 hr⁻¹ | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Off Gas | Time, min. | 2 | 6 | 10 | 15 | 20 | 25 | 30 |
| | NOx ppm | 0.2 | .6 | .9 | 1.3 | 2.2 | 3.2 | 4.6 |
| | CO ppm | | | | | | | |
| | SO₂ ppb | | | | | | | |

Comments: This test demonstrates absorption—regeneration—absorption at 300° F.–350° F. with steam as the carrier gas and hydrogen as the reactant gas; and a three minute regeneration.

### Example 4

| | Absorption temp 300° F.; GHSV 20,000 hr⁻¹ | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Off Gas | Time, min. | 2 | 6 | 10 | 15 | 20 | 25 | 30 |
| | NOx ppm | 1.15 | 1.95 | 3.3 | 5.0 | 6.8 | 8.2 | 9.6 |
| | CO ppm | .2 | .6 | 0.9 | 1.3 | 1.8 | 2.1 | 2.4 |
| | SO₂ ppb | 2.9 | 2.8 | 6.7 | 11.8 | 16.7 | 21.9 | 25.5 |

## 6

### -continued

| Absorption temp 300° F.; GHSV 20,000 hr⁻¹ | | | | | | |
|---|---|---|---|---|---|---|
| Regeneration conditions 300° F.; GHSV 4,200 hr⁻¹ | | | | | | |
| Inlet Gas | H₂ | % N₂ | % CO₂ | % H₂O | | ppm CO |
| | 2,000 | 76.3 | 13.5 | 10 | | 506 |
| Off Gas | Time, min. | 2 | 4 | 6 | 10 | 16 | 20 |
| | NOx ppm | 2.5 | 0.55 | 0.37 | 24 | .17 | .14 |
| | CO ppm | 15 | 8.4 | 10.8 | 15.3 | 20.5 | 14.9 |
| | SO₂ ppb | 97 | 16.5 | 8.7 | 8.1 | 7.9 | 7.7 |

| | Absorption temp 300° F.; GHSV 20,000 hr⁻¹ | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Off Gas | Time, min. | 2 | 6 | 10 | 15 | 20 | 25 | 30 |
| | NOx ppm | .83 | 1.53 | 2.5 | 4.0 | 5.5 | 6.8 | 8.5 |
| | CO ppm | 0 | .4 | .7 | 1.0 | 1.4 | 1.5 | 1.8 |
| | SO₂ ppb | .2 | .4 | 4.2 | 7.7 | 12.6 | 16.6 | 21.4 |

Comments:
This test demonstrates absorption—regeneration—absorption with regeneration using nitrogen as the carrier gas and hydrogen and carbon monoxide as the reactant gases at 300° F. at a GHSV of 4,200 hr⁻¹. The absorptions were done at 300° F.

### Example 5

| | Absorption temp 300° F.; GHSV 20,000 hr⁻¹ | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Off Gas | Time, min. | 2 | 6 | 10 | 15 | 20 | 25 | 30 |
| | NOx ppm | .45 | .7 | 1.05 | 1.5 | 2.0 | 2.5 | 3.4 |
| | CO ppm | 0 | .4 | 0.9 | 1.2 | 1.5 | 1.9 | 2.2 |
| | SO₂ ppb | 0 | 0 | 0 | 1.1 | 2.8 | 3.7 | 5.7 |

| Regeneration conditions temp 300° F., GHSV 1000 hr⁻¹ | | | | | | |
|---|---|---|---|---|---|---|
| Inlet Gas | | ppm H₂ | | % H₂O | | |
| | | 2000 | | 99.8 | | |
| Off Gas | Time, min. | 2 | 6 | 10 | 13 | 16 | 20 |
| | NOx ppm | 0 | 0.25 | 0.11 | 0.05 | 0.15 | .25 |
| | CO ppm | 0 | 0 | 0 | 0 | 0 | 0 |
| | SO₂ ppb | 0 | 0 | 0 | 0 | 0 | 0 |

Comments:
The efficiency of NOx destruction was 99.85% that is, only 0.15% of the NOx absorbed was desorbed as NOx, and the remainder was converted to elemental nitrogen. Note: the K₂CO₃ concentration on the catalyst was 10% for this test.

### Example 6

| | Absorption temp 300° F.; GHSV 20,000 hr⁻¹ | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Off Gas | Time, min. | 2 | 6 | 10 | 15 | 20 | 25 | 30 |
| | NOx ppm | .35 | .45 | .55 | .75 | 1.3 | 1.85 | 2.9 |
| | CO ppm | 0 | 0 | 0 | .1 | .2 | .3 | .4 |

| Regeneration conditions temp 300° F., GHSV 1000 hr⁻¹ | | | | | | |
|---|---|---|---|---|---|---|
| Inlet Gas | composition | % H₂ | % CO₂ | % H₂O | | |
| | | 1.73 | 1.28 | Balance | | |
| Off Gas | Time, min. | 0.5 | 1 | 2 | 3 | 4 | 5 | 20 |
| | NOx ppm | .05 | .03 | .01 | .03 | .03 | | |
| | CO ppm | | | | | | | |
| | SO ppb | 7.4 | 7.3 | 7.2 | 7.2 | 7.3 | | |

5,599,758

**7**

Comments:

This test was done with a five minute regeneration using steam as the carrier gas and hydrogen as the reactant gas with carbon dioxide present. The efficiency for NOx destruction was 99.69%. The $K_2CO_3$ concentration on the catalyst/absorber was 10% for this test.

Example 7

| Absorption temp 300° F.; GHSV 20,000 hr⁻¹ | | | | | | | |
|---|---|---|---|---|---|---|---|
| Off Gas | Time, min. | 2 | 6 | 10 | 15 | 20 | 25 | 30 |
| | NOx ppm | .7 | .75 | .80 | 1.05 | 1.25 | 1.7 | 2.4 |
| | CO ppm | 0 | 0 | 0 | 0 | 0 | 0.1 | 0.3 |
| | SO₂ ppb | 0 | 0 | 0 | 0 | 0 | 1.2 | 3.1 |

| Regeneration conditions temp 300° F., GHSV 4,600 hr⁻¹ | | | | | | |
|---|---|---|---|---|---|---|
| Inlet Gas | | % H₂ | | % H₂O | | |
| | | 1.73 | | 98.2 | | |
| Off Gas | Time, min. | 0.5 | 2 | 4 | 6 | 8 | 10 | 20 |
| | NOx ppm | 0 | 0.6 | 0.5 | .75 | .72 | .72 | |
| | CO ppm | 0 | 0 | 0 | 0 | 0 | 0 | |
| | SO ppb | 0 | 0 | 0 | 0 | 0 | 0 | |

Comments:

This test demonstrates regeneration using steam as the carrier gas and hydrogen as the reactant gas at 300° F. and GHSV of 4,600 hr⁻¹. The efficiency for NOx destruction was 99.92%. The $K_2CO_3$ concentration on the catalyst was 10% for this test.

The next Examples, 8 to 12, use organometallic platinum in the catalyst/absorber.

Catalyst for Examples 8 to 12 — Organometallic platinum alumina was coated with 1.6 gms/cu in alumina. Platinum loading 46 gms/cu ft. calcined at 500° C. $K_2CO_3$ absorber 10% impregnated at 60° C.

Absorption inlet gas composition

| N₂ | 73% | SO₂ | 99 ppb |
|---|---|---|---|
| CO₂ | 3% | NOx | 30 ppm |
| Water | 10% | CO | 10 ppm |
| O₂ | 13.8 | | |

Example 8

| Absorption temp 300° F. | | | | | | | |
|---|---|---|---|---|---|---|---|
| Off Gas | Time, min. | 2 | 6 | 10 | 15 | 20 | 25 | 30 |
| | NOx ppm | 0.7 | 0.8 | 0.95 | 1.45 | 2.5 | 4.5 | 6.8 |
| | CO ppm | 0 | 0 | 0 | 0 | 0 | 0 | 0.1 |
| | SO₂ ppb | 0 | 0 | 0 | 0.2 | 4.0 | 10.4 | 15.8 |

| Regeneration conditions temp 350° F., GHSV 6000 hr⁻¹ | | | | | | |
|---|---|---|---|---|---|---|
| Inlet Gas composition | | % H₂ | % N₂ | % CO₂ | % H₂O | |
| | | 0.1 | 76.8 | 13.13 | 10 | |
| Off Gas | Time, min. | 1 | 3 | 5 | 9 | 11 | 14 |
| | NOx ppm | 52 | 36 | 25 | 0.07 | 0.65 | 0.65 |

Comments:

The test demonstrates regeneration with hydrogen as the reactant gas and nitrogen at the carrier gas at 300°–350° F. The efficiency for NOx destruction was 93.4%.

**8**

Example 9

| Absorption temp 300° F.; GHSV 20,000 hr⁻¹ | | | | | | | |
|---|---|---|---|---|---|---|---|
| Off Gas | Time, min. | 2 | 6 | 10 | 15 | 20 | 25 | 30 |
| | NOx ppm | 0.95 | .99 | 1.17 | 1.7 | 2.9 | 4.7 | 6.6 |
| | CO ppm | 0 | 0 | 0 | 0 | 0.1 | 0.1 | 0.2 |
| | SO₂ ppb | 0 | 0 | 0 | 0.8 | 3.8 | 10.7 | 15.2 |

| Regeneration conditions | | | | | | |
|---|---|---|---|---|---|---|
| Inlet Gas | composition | | % N₂ | % CO₂ | % H₂O | |
| | | | 76.8 | 13.1 | 10 | |
| Off Gas | Time, min. | 2 | 4 | 8 | 10 | 15 | 17 |
| | NOx ppm | 21.5 | 27 | 18.5 | 19 | 2.5 | 0.8 |
| | SO₂ ppb | 50.1 | 71 | 55 | 47 | 16 | 9 |

Comments:

This test demonstrates regeneration using carbon monoxide as the reactant gas and nitrogen as the carrier gas. The efficiency for NOx destruction was 93.0%.

Example 10

| Absorption temp 300° F.; GHSV 20,000 hr⁻¹ | | | | | | | |
|---|---|---|---|---|---|---|---|
| Off Gas | Time, min. | 2 | 6 | 10 | 15 | 20 | 25 | 30 |
| | NOx ppm | 1.15 | 1.15 | 1.3 | 1.7 | 2.7 | 4.0 | 5.9 |

| Regeneration conditions | | | | | | |
|---|---|---|---|---|---|---|
| Inlet Gas | composition | % H₂ | % N₂ | % CO₂ | % H₂O | ppm CO |
| | | 1000 | 76.8 | 13.1 | 10. | 500 |
| Off Gas | Time, min. | 2 | 4 | 6 | 10 | 12 |
| | NOx ppm | 60 | 37 | 1.0 | 0.97 | 0.95 | 0.93 |
| | CO ppm | 4.3 | 4.2 | 4.7 | 7.9 | 8.0 | 8.6 |

Comments:

This test demonstrates regeneration using hydrogen and carbon monoxide as reactive gases and nitrogen as the carrier gas. The efficiency for NOx destruction was 92.9%.

Example 11

| Absorption temp 300° F.; GHSV 20,000 hr⁻¹ | | | | | | | |
|---|---|---|---|---|---|---|---|
| Off Gas | Time, min. | 2 | 6 | 10 | 15 | 20 | 25 | 30 |
| | NOx ppm | 1.2 | 1.3 | 1.55 | 2.25 | 3.25 | 4.95 | 7.9 |
| | CO ppm | .1 | .1 | .1 | .1 | .2 | .2 | .3 |
| | SO₂ ppb | 0 | 0 | .4 | 2 | 5 | 9.6 | 20.0 |

| Regeneration conditions temp 350° F., GHSV 6000 hr⁻¹ | | | | | | |
|---|---|---|---|---|---|---|
| Inlet Gas | H₂ ppm | % N₂ | % CO₂ | % H₂O | ppm CO | |
| | 1442 | 76.7 | 13.1 | 10.0 | 721 | |
| Off Gas | Time, min. | 1 | 2 | 3 | 4 | |
| | NOx ppm | | 5.0 | | 1.0 | |
| | SO₂ ppb | | 39.2 | | 9.9 | |

Comments:

This test demonstrated regeneration using hydrogen and carbon monoxide as reactant gases and nitrogen as the carrier gas. The efficiency for NOx destruction was 99.5%.

5,599,758

| 9 | 10 |

## Example 12

| Off Gas | Absorption temp 350° F.; GHSV 20,000 hr⁻¹ | | | | | | |
|---|---|---|---|---|---|---|---|
| Time, min. | 2 | 6 | 10 | 15 | 20 | 25 | 30 |
| NOx ppm | 0.4 | 0.65 | 1.15 | 3.05 | 5.2 | 6.95 | 8.6 |
| SO₂ ppb | 0 | 0 | 1.1 | 5.5 | 92.2 | 16.6 | 20.6 |

Regeneration conditions temp 350° F., GHSV 4,200 hr⁻¹

| Inlet concentrations | H₂ ppm | | ppm CO | | |
|---|---|---|---|---|---|
| | 2000 | | 1000 | | |
| Off Gas Time, min. | 2 | 4 | 6 | 10 | 16 | 21 |
| NOx ppm | 15 | 0.3 | 0.23 | 0.15 | 0.12 | 0.11 |
| CO ppm | 4.2 | 10.8 | 13.5 | 15.1 | 32 | 32 |

Comments:

This test demonstrated regeneration using hydrogen and carbon monoxide as reactant gases and nitrogen as the carrier gas at 350° F. The efficiency for destruction of NOx was 99.8%.

A person of ordinary skill in the art may make changes and modifications to the present process without departing from the spirit and scope of the present invention. It is contemplated that the present invention is encompassed by the claims as presented herein and by all variations thereof coming within the scope of equivalents accorded thereto.

The invention claimed is:

1. A method of regenerating a devitalized absorber having nitrogen oxides absorbed therein or thereon, said method comprising the steps of:

providing a stream of regenerating gas comprising a reducing gas, said reducing gas having an effective amount for removing said nitrogen oxides from said devitalized absorber, and an inert carrier gas; and

passing said stream of regenerating gas comprising an inert carrier gas and a component selected from the group consisting of hydrogen, carbon monoxide and mixtures thereof over said devitalized absorber comprising an alumina support with a platinum coating thereon and having nitrogen oxides absorbed therein or thereon for an effective time, at an effective temperature and at an effective space velocity to remove said nitrogen oxides from said devitalized absorber to form a regenerated absorber.

2. The method of claim 1 wherein said temperature is in the range of 250° F. to 750° F.

3. The method of claim 1 wherein said regenerating gas further comprises up to 10% carbon dioxide.

4. The method of claim 1 wherein reducing gas is carbon monoxide.

5. The method of claim 1 wherein said reducing gas is hydrogen.

6. The method of claim 1 wherein said reducing gas is a mixture of carbon monoxide and hydrogen.

7. The method of claim 1 wherein the space velocity is in the range of 10 hr⁻¹ to 100,000 hr⁻¹.

8. The method of claim 7 wherein the space velocity is in the range of 500 to 16,000 hr⁻¹.

9. The method of claim 1 wherein the absorber has a coating of an alkali or alkaline earth carbonate or bicarbonate thereon.

10. The method of claim 9 wherein the alkali or alkaline earth carbonate is a potassium carbonate.

11. The method of claim 1 wherein the absorber may be aqueous or non-aqueous platinum.

12. The method of claim 1 wherein the the inert carrier gas comprises helium, argon or steam.

13. A method of regenerating a devitalized catalyst/absorber and having nitrogen oxides absorbed therein or thereon, comprising the steps of:

providing a stream of inert carrier gas containing an effectuating amount of a reducing agent selected from carbon monoxide, hydrogen gas and mixtures thereof said stream further characterized as containing at least carbon monoxide or carbon dioxide for removing said nitrogen oxides from said catalyst/absorber and restoring a carbonate form for said alkali or alkaline earth;

passing said gaseous stream over said exhausted catalyst/absorber comprising an oxidation catalyst specie selected from platinum, palladium, rhodium, cobalt, nickel, iron, copper, molybdenum or combinations thereof disposed on a high surface area support, said catalytic component being intimately and entirely coated with an absorber material selected from a hydroxide, carbonate, bicarbonate or mixture thereof of an alkali or alkaline earth or mixtures thereof and having nitrogen oxides absorbed therein or thereon for an effective time, at a temperature in the range of 250° to 750° F. and at a GHSV in the range of 10 to 100,000 hr⁻¹ to remove said nitrogen oxides from said devitalized catalyst/absorber to form a regenerated catalyst/absorber.

14. The method of claim 13 wherein said inert carrier gas comprises nitrogen, steam or mixtures thereof.

15. The method of claim 14 wherein said inert carrier gas comprises nitrogen and said reducing agent comprises about 500 ppm to 10% carbon monoxide.

16. The method of claim 14 wherein said inert carrier gas comprises steam.

17. The method of claim 14 wherein said inert carrier gas comprises nitrogen and said reducing agent comprises about 500 ppm to 10% hydrogen.

18. The method of claim 14 wherein said alkali or alkaline earth is lithium, sodium, potassium or calcium.

19. The method of claim 18 wherein said alkali or alkaline earth comprises potassium.

20. The method of claim 14 wherein said inert carrier gas comprises steam.

*   *   *   *   *

# United States Court of Appeals
# for the Federal Circuit

*EmeraChem Holdings, LLC v. Volkswagen Group of America,* 2016-1984

## CERTIFICATE OF SERVICE

I, Elissa Matias, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by LUDEKA NEELY GROUP, PC, counsel for Appellant to print this document. I am an employee of Counsel Press.

On **August 10, 2016,** counsel has authorized me to electronically file the foregoing **BRIEF OF APPELLANT** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

    Steven F. Meyer
    Principal Counsel
    Seth J. Atlas
    Joseph A. Farco
    Locke Lord LLP
    Brookfield Place, 200 Vesey Street
    20th Floor
    New York, NY 10281-2101
    212-415-8600
    smeyer@lockelord.com
    tlas@lockelord.com
    arco@lockelord.com

Paper copies will also be mailed to the above principal counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court within the time provided in the Court's rules.

August 10, 2016                                      /s/ Elissa Matias
                                                          Counsel Press

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e)

  X   The brief contains <u>11,819</u> words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

      The brief uses a monospaced typeface and contains        lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6)

  X   The brief has been prepared in a proportionally spaced typeface using <u>M.S. Word 2013</u> in a <u>14</u> point <u>Times New Roman</u> font or

      The brief has been prepared in a monospaced typeface using                in a     characters per inch        font.

Dated:  August 10, 2016      /s/ Michael J. Bradford/
                               Michael J. Bradford (Reg. No. 52,646)
                               LUEDEKA NEELY GROUP, P.C.

                               COUNSEL FOR APPELLANT
                               EMERACHEM HOLDINGS, LLC